**COX et al. v. WINDHAM et al. (No. 7242.)**

Court of Civil Appeals of Texas. Austin. Sept. 26, 1928.

Rehearing Denied Oct. 17, 1928.

319 acres of land and certain personal property were devised in trust to T. M. Windham for the purpose of converting same into cash; and after paying the $500 legacy to Cox and all expenses of administration, the remainder was to be paid to the children and grandchildren as directed by the will. In order that he might bring this suit, Marion M. Cox purchased the interest of Mrs. Amanda Floyd in the 319 acres of land, save and except one-half of the mineral rights therein. The land was ordered sold as directed by the will, and no attack is made on the judgment in this respect. The appeal is based upon the following matters:

1. Appellants alleged that there came into the hands of said executor 83 head of registered Hereford cattle of the value of $150 each, and 250 head of grade or unregistered cattle of the value of $45 each, which he had not accounted for. All the defendants joined appellee T. M. Windham in his answer that he purchased all the cattle owned by his father before his death, and that he had paid the purchase price either to S. R. Windham or to his estate. In reply appellants alleged that if there were any such pretended sales of the cattle by S. R. Windham he was of unsound mind at the time and not capable of making the sales; and that if they were mistaken as to this, they alleged that at the time he was old and feeble in mind and body and under the influence of T. M. Windham, which brought about the sales.

On these issues the jury found, in substance, that T. M. Windham purchased 20 head of registered cattle from his father at the agreed price of $75 per head, which was their reasonable market value, and that the purchase price was paid; that he purchased 110 head of grade cattle from his father at an agreed price of $50, $40, $40, $30, and $20 per head, under a certain agreed classification of the cattle, which was their reasonable market value; and that the total purchase price of $3,630 had been paid to the estate; and further found that at the time each of these sales were made S. R. Windham was of sound mind, knew what he was doing, and understood the nature of the transaction. These findings are all attacked by appellants upon the ground that they are so contrary to the overwhelming weight of the testimony as to show prejudice on the part of the jury. We do not sustain the contentions.

T. M. Windham testified that he purchased the registered cattle from his father and upon his solicitation, in May, 1917, at the agreed price of $75 per head, the calves being "thrown in"; that this was the reasonable market value of the cattle in their starved and stunted condition due to the extreme drought of that year; that he paid his father $250 at the time and agreed to pay him the

Jenkins, Miller & Wilson, of Brownwood, for appellants.

McCartney & McCartney, of Brownwood, for appellees.

BLAIR, J. Appellants Marion M. Cox, a stepson, and Mrs. Amanda Floyd, a daughter of S. R. Windham, deceased, instituted this suit against T. M. Windham, a son of S. R. Windham, as independent executor under the will of S. R. Windham, and also individually, alleging that he had not accounted to the heirs of S. R. Windham for the property coming into his hands as executor, pleading in detail such alleged property. The living children of S. R. Windham and the children of his deceased children were made parties defendant upon the allegation that they had an interest in 319 acres of land involved in the suit. By the will of S. R. Windham specific parts of his estate were devised to his children and grandchildren, and a cash legacy of $500 was given to appellant Marion M. Cox. The

138

balance as soon as he sold some cattle; that in August thereafter he paid his father $1,-000, and that his father told him to pay $250 to Mary (now appellee Mrs. Mary, Bowden), who was not married at the time and had been her father's housekeeper since the death of her mother in 1914; that he offered to pay her the $250, but she told him she did not need the money and to keep it until later, which he did; and that thereafter, in January, 1918, after his father had died in December, 1917, he paid her the $250. Mrs. Bowden confirmed this testimony, her verison of the payment of the $250 to her being as follows:

"He (meaning T. M. Windham) gave me a check for $249.00, and then he paid me $1.00, and that made all of it. As to how it happened that he gave me a check for $249.00; well, I had asked for $1.00 one day and he owed me this (meaning the $250.00), and he gave me $1.00. My father had told Top to give me the $250.00 before that. He (meaning S. R. Windham) told me Top had finished paying him what he wanted for the cattle, except the check to me, and I told him (T. M. Windham) he could wait, and he did not give me my check until about the first of January the next year."

The questions as to the value and the payment of the purchase price of registered cattle were for the jury, and the above testimony sufficiently supports their findings thereon. As to the number of registered cattle, both T. M. Windham and Mrs. Bowden testified that when the cattle were delivered there were 20 cows and some 3 or 4 calves, which were thrown in under the agreement. The jury found that there were 20 cows, and no issue as to the number of calves was submitted. This testimony supports the jury finding, although there was other evidence that some time before the death of S. R. Windham he owned from 43 to 83 head of registered cattle.

With reference to the purchase of the grade cattle there is no material conflict but that the purchase price was reasonable; that it aggregated $3,630, and had been paid into the estate. The only conflict is with reference to the number of these cattle. T. M. Windham testified that he was to pay $50 for cows with calves, $40 for dry cows, $40 for two-year old steers, $30 for yearling steers, and $20 for heifer yearlings; that under this classification there were 110 head of cattle of the aggregate value of $3,630, which amount he had paid to the estate after his father's death. This testimony supports the jury's findings, although other witnesses testified to a larger number.

■ With reference to the issue of mental capacity of S. R. Windham to make the sales and as to the alleged undue influence of T. M. Windham in inducing the sales, we find the evidence sufficiently supports the jury's findings thereon. On the mental capacity issue several doctors testified both pro and con.

Several nonexpert witnesses testified to certain acts of S. R. Windham upon which they based their conclusions that he was of unsound mind. These were: (a) That he was a radical antiprohibitionist, and in arguments of the question he called prohibitionists who drank liquor vile names; (b) that he was an ex-Confederate veteran, and called Yankees vile names and was easily excited and thrown into a rage when the question was mentioned; (c) that he said he would not support his church because the preacher referred to and argued for prohibition in the pulpit; (d) that he slapped a preacher and another person because they called him "Uncle Sam," giving as his reason for doing so that he was reared in slavery times and that only old negro men were called "Uncle" by those not related to them; and (e) that after the death of his wife he spent considerable time in picking up clean pebbles and pretty rocks with which to beautify her grave as well as the graves of some of his deceased children. At the most, these present mere matters of eccentricity, and the jury's finding that he was of sound mind will not be disturbed.

■ On the issue of undue influence of T. M. Windham in bringing about the sale, the testimony is very meager and rather shows the contrary to be true. Deceased was 76 years of age, but according to all the witnesses was a man of decided views and will power. During his last days he had epileptic fits, and for fear he would fall from his horse while looking after the cattle and because of old age and declining health, he expressed a desire to sell all his cattle in order that he might not be troubled with them. A buyer hearing that he desired to sell the grade cattle went to look at them, and deceased told him he had sold to his son and the price that he had obtained. This buyer told him he had gotten more than he could have paid for the cattle. So it appears from all the testimony that T. M. Windham probably had nothing to do with inducing the sale, at least the jury's finding that he did not is amply supported by the evidence.

In connection with all these issues, appellants urge certain alleged discrepancies in the testimony of T. M. Windham, as well as certain alleged impeaching testimony, but all of it simply affects the credibility of the witness, and was therefore a matter for the jury to pass upon. With reference to some of the alleged discrepancies, the jury could certainly have considered them immaterial, since most of the transactions took place more than 10 years before this suit was filed.

■ 2. Appellants contend that the executor should account to the estate for the $250 paid to Mrs. Mary Bowden as a part of the purchase price of the cattle, upon the ground that same was a voluntary gift to her without any valuable consideration, not completed or paid during the lifetime of the donor, and

was therefore revoked by his death. We do not sustain this contention.

■ It is settled law that where property is delivered to a third person under conditions indicating the donor intended to make an effective gift, it will be so treated; or where donor relinquishes all dominion over the property, it is sufficient to complete the gift, which in such case is not revoked by the subsequent death of the donor before actual delivery to the donee. Thompson v. Caruthers, 92 Tex. 530, 50 S. W. 331; Lewis v. Castleman, 27 Tex. 415; Schauer v. Von Schauer (Tex. Civ. App.) 138 S. W. 145; Jarrell v. Crow, 30 Tex. Civ. App. 629, 71 S. W. 397; Reynolds v. Reynolds, 92 Ky. 556, 18 S. W. 517; Goelz v. Bank, 31 Ind. App. 67, 67 N. E. 234; Horn v. Horn, 152 Wis. 482, 140 N. W. 58; Morgan v. Williams, 179 Ky. 428, 200 S. W. 650.

The facts heretofore stated with reference to this gift bring it within the rules above announced. Clearly the donor delivered the cattle with intention that T. M. Windham, the purchaser, pay $250 of the purchase price to Mary. It also clearly appears that donor never intended to exercise any dominion or control over the $250, but trusted T. M. Windham to pay it to Mary when he sold some cattle. This he offered to do in August, 1917, but she told him that she did not need it, but would wait until later. This transaction amounted to a loan of the money tendered donee to T. M. Windham, and for which she could have maintained suit if he had subsequently refused to pay it. Or, as is said in the case of Reynolds v. Reynolds, supra:

"Suppose, as is urged by the defense, that the husband had the money in his own pocket, —the proceeds of the sale of this land. It was then not necessary [that] there should have been an actual delivery of the money to the daughter by him, and then a reloaning back to the father."

Especially are these rules of law applicable here in view of the further rule that delivery of personal property is not so strictly applied to transactions between members of a family residing in the same house, as is applied to transactions between strangers. Donaldson v. Everett, 122 Ga. 318, 50 S. E. 94; Shepard v. Shepard, 164 Mich. 183, 129 N. W. 201.

■ 3. Appellants contend that the executor should not have been allowed credit on his account for the $191.82 paid to Sam Brin, because no itemized account of the indebtedness was furnished him by Brin, and that all he knew about it was that his father told him before his death that he owed Brin about $200. Brin had been out of business some seven years when this suit was filed. T. M. Windham testified that he called on Brin for the account soon after his father's death; that he took it to his sister Mary, who lived with her father, and she told him the account was all right; and that he then paid it. So

we see no just reason why the jury should not have allowed the credit.

4. The contention is made that a note signed jointly by W. O. Windham and S. R. Windham to a Brownwood bank for $833.35 should not have been allowed on the executor's account because the evidence tended to show that S. R. Windham signed it merely as surety for W. O. Windham. This issue, like the other issues, was for the jury to determine, and the evidence thereon sufficiently supports their finding that it was the debt of S. R. Windham.

5. The jury found, in answer to a special issue, that at the time of S. R. Windham's death he owed debts, exclusive of any devise or bequest in the will, aggregating $5,693.32. Appellants contend that this finding included an item of $900 claimed to have been paid by the executor to Cross Plains Lumber Company, representing lumber with which to build a house for W. O. Windham, a son of S. R. Windham, and alleged to be a gift of his father to him. The contention is not sustained, because the record conclusively shows that the jury did not allow this item on the executor's account. The executor's account showed items of indebtedness owing by S. R. Windham at the time of his death, exclusive of the $900 item, aggregating $5,542.32, and of these only the items of Sam Brin for $191.82 and the $833.35 are contested on this appeal. We have heretofore held that both the note and the Brin item were properly allowed. The jury found the total indebtedness to be $5,693.32. If the total of the undisputed items, the note and the Brin item, is subtracted from the total indebtedness found by the jury, it leaves a difference of only $151, and conclusively shows that the jury did not allow the $900 item complained of. The jury also found that the executor had paid $5,613.32 of this total indebtedness, the item of $80 due Mark Ragsdale being the only one not paid. The executor also testified that he had only paid $300 of the $900 item. It is therefore clear that the jury did not consider the $900 item as owing by the estate, otherwise they would have found that $600 of it had not been paid; whereas, they found that only the $80 due Ragsdale had not been paid.

Just what items of indebtedness the jury considered to make up the $151 discrepancy between the total indebtedness found and the undisputed items contained in the executor's account is not clear, since they were only asked to find the total indebtedness without itemizing it. However, the executor alleged that he had paid other debts and introduced checks in evidence aggregating something over $100, not shown in his itemized account filed in the suit. In any event, the jury found that the executor had paid all indebtedness save $80 due Ragsdale and $200 due attorneys for probating the will; and appellants are therefore protected against having to pay any further claims out of the estate's funds.

6. The contention of appellants that the jury also allowed on the executor's account the $250 paid to Mrs. Mary Bowden, as a part of the purchase price of the registered cattle, is without merit, for the reasons above stated with reference to the $900 item. Clearly the jury did not include it in the total indebtedness finding. Besides this, the executor did not ask that the $250 so paid be allowed as a credit on his account.

7. Complaint is made that the jury's finding of $500 for the services of the executor is excessive. We think the evidence sustains their finding. For more than 10 years the executor has looked after the estate, and the numerous matters which he attended to and hereinabove related would justify the finding of the jury.

8. Appellants complain that the court erred in excluding the testimony of Tom Smith with reference to the mental condition of S. R. Windham. It appears from the court's qualification on the bill of exception that the testimony was objected to on Friday preceding the closing of the evidence on the following Tuesday; that shortly after witness retired from the courtroom appellees in open court withdrew their objection. Appellants made no showing as to why they did not or could not obtain this testimony during the remaining four days of the trial, and therefore failed to show diligence.

9. Complaint is also made that the trial court erred in refusing to grant appellants a new trial in order that they might have the benefit of certain alleged newly discovered evidence relating to the mental condition of S. R. Windham. An examination of this testimony reveals the fact that it is merely cumulative of the testimony of many witnesses who did testify on that issue, and the trial judge did not abuse the discretion vested in him to refuse a new trial under such circumstances.

We have carefully examined all assignments urged by appellants, and find that neither of them presents any error requiring a reversal of this judgment, and it will therefore be affirmed.

Affirmed.

BAUGH, J., not sitting.