T.C. Memo. 1995-601


UNITED STATES TAX COURT


TRACY P. STREBER, F.K.A. TRACY C. PARKER, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 345-92, 352-92,         Filed December 20, 1995.
         900-92.


     Petitioner father (P1) entered into certain earnest money contracts to purchase land that P1 intended to develop through a joint venture with third parties who would provide the operating capital. P1 intended for his daughters (P2 and P3) to have an interest in both the land and a future joint venture to develop the land. To this end, P1 arranged to have an agent act on behalf of P2 and P3 with respect to the earnest money contracts and the joint venture. After the joint venture began, the third parties "bought-out" P1, P2, and P3 by giving them promissory notes. Years later, subsequent to litigation in which P2 and P3 participated, the notes were paid.

_____

[1]    Cases of the following petitioners are consolidated herewith: Teresa P. Delony, F.K.A. Teresa R. Davis and Stephen J. Davis, docket No. 352-92; Larry B. and Martha A. Parker, docket No. 900-92.

R asserted inconsistent income tax deficiencies with respect to P1, P2, and P3.  R claimed that P1 owned the promissory notes until the time they were paid, meaning that only P1 is taxable on the note proceeds.  In the alternative, R claimed that P1 gave P2 and P3 an interest in the joint venture at the time of its inception, meaning that only P2 and P3 are taxable on the note proceeds.  R also imposed additions to tax under secs. 6653 and 6661(a), I.R.C., against all petitioners.

1.  Held:  P1 gave P2 and P3 certain rights under the earnest money contracts and is therefore not taxable on the note proceeds.

2.  Held, further, P2 and P3 owned the notes at the time the notes were paid and are therefore taxable on the note proceeds.

3.  Held, further, R's imposition of additions to tax under secs. 6653 and 6661, I.R.C., is not sustained as to P1.

4.  Held, further, because P2 and P3 failed to carry their burden of proof with respect to the additions to tax, R's imposition of additions to tax under secs. 6653 and 6661, I.R.C., is sustained as to P2 and P3.

Timothy O'Dowd and Edwin K. Hunter, for petitioners in docket Nos. 345-92 and 352-92.

Robert I. White, Linda S. Paine, and William Grimsinger, for petitioners in docket No. 900-92.

Stephen J. Davis, pro se in docket No. 352-92.

William Bissell, Portia N. Rose, and David B. Mora, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  For 1985, respondent determined deficiencies in income tax and additions to tax against petitioners Larry B. Parker (Parker) and Martha A. Parker (Martha) resulting from their failure to report gain with respect to payments received in discharge of two $2 million notes.  For 1985, respondent also determined deficiencies in income tax and additions to tax against Parker's two daughters, petitioners Tracy P. Streber (Tracy) and Teresa P. Delony (Teresa), and against Teresa's husband, petitioner Stephen J. Davis (Davis), for failure to report gain with respect to those same payments.  Respondent has taken inconsistent positions but does not seek to tax the same gain twice.  She asks the Court to determine who, as between the Parkers, on the one hand, and the daughters and Davis, on the other, is properly taxable with respect to the payments in question.  Because the cases of those various petitioners involve common questions of fact, they have been consolidated for trial, briefing, and opinion.

Although Teresa and Davis jointly petitioned the Court to redetermine the deficiency and additions to tax determined by respondent, Davis, in the prosecution of his case, has failed to proceed as provided by the Tax Court Rules of Practice and Procedure.  The Court therefore holds him in default and will

enter a decision with respect to him consistent with the decision to be entered with respect to Teresa.  See Rule 123(a).

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiencies in income tax and additions to tax determined by respondent against petitioners are as follows:

|  |  |  |  | Additions to Tax | | |
|  |  |  |  | Sec. | Sec. | Sec. |
| Docket No. | Petitioner | Year | Deficiency | 6653(a)(1) | 6653(a)(2) | 6661(a) |
| 345-92 | Tracy | 1985 | $362,594.10 | $18,129.71 | * | $90,649 |
| 352-92 | Teresa and Davis | 1985 | 365,924.20 | 18,296.21 | * | 91,481 |
| 900-92 | Parkers | 1985 | 1,482,266.80 | 74,113.34 | * | 370,567 |

* 50 percent of the interest due on the amount of the deficiency.

The Parkers and respondent have entered into a stipulation of settled issues, which the Court accepts.  Certain other issues have otherwise been resolved.  The issues remaining for decision can be divided into several groups.  The first group is as follows:  (1) Whether Parker made gifts to the daughters that resulted in the daughters' having interests in a certain joint venture in January 1980, (2) whether Parker owned the interest in the joint venture and made gifts to the daughters in March 1981 of notes resulting from a sale of that interest, or (3) whether Parker made gifts of the proceeds from those notes to the

daughters in 1985.[2]  If issue (1) is answered affirmatively, then (A) gain is recognized to the daughters, not Parker, in 1985, (B) there is no issue as to the amount of gain recognized to each, and (C) we must decide whether the daughters are liable for the additions to tax determined against them.  If issue (2) is answered affirmatively, then the remaining issues are the same except that we must also determine the amount of gain recognized to the daughters in 1985.  If issue (3) is answered affirmatively, then (A) gain is recognized to Parker, not the daughters, in 1985 (unless certain admissions of respondent's estop her from now claiming that the Parkers must report such gain), (B) we must determine the amount of gain recognized to Parker in 1985, based on certain arguments made by the Parkers, (C) we must determine whether Martha is an innocent spouse, relieved of liability pursuant to section 6013(e), and (D) we must determine whether Parker is (or the Parkers are) subject to the additions to tax determined by respondent.

## FINDINGS OF FACT

Stipulations

The parties have entered into the following stipulations of facts that have been filed by the Court:

---

[2]    For simplicity, in describing the various possible gifts, we have ignored the community property interest of Betty Parker (Betty) in the property in question.  Betty was Parker's wife from sometime in 1958 until their divorce in 1982.  Because it is not significant to our analysis, we will continue to ignore Betty's community property interest in such property.

1. Stipulation of Facts between respondent and all petitioners (except Stephen J. Davis at docket No. 352-92).

2. Stipulation of Facts between Steven J. Davis and respondent.

3. Stipulation I.

4. Supplement to Stipulation I.

5. Stipulation II between respondent and petitioners Larry B. and Martha A. Parker.

6. Supplement to Stipulation II between respondent and petitioners Larry B. and Martha A. Parker.

7. Stipulation IV between respondent and all petitioners (except Stephen J. Davis at docket No. 352-92).

All stipulated facts contained in such stipulations are found as stipulated, and all such stipulations and attached exhibits are incorporated herein by this reference. Some of respondent's proposed findings of fact have been conceded by the daughters and, accordingly, are so found.[3]

---

[3] In part, Rule 151 provides as follows:

RULE 151. BRIEFS

* * * * * * *

(e) Form and Content: * * *

* * * * * * *

(continued...)

Residences

At the time the petitions in these cases were filed, the residence of the Parkers was in Houston, Texas, and the residences of Tracy, Teresa, and Davis were in Austin, Texas.

Family Background

Parker married Betty Parker (Betty) during 1958, and they were divorced on March 12, 1982. Tracy and Teresa are the daughters of Parker and Betty. Tracy was born in 1965, and Teresa was born in 1960. Parker, Betty, and the daughters lived in California during the 1960's and early 1970's. In 1972, they moved to Houston, Texas, where Parker continues to reside. In 1983, following his divorce from Betty, Parker married Martha.

---

3 (...continued)

(3) * * * In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

In the instant case, respondent, the Parkers, and the daughters filed simultaneous opening and reply briefs. The daughters' reply brief contains objections to the Parker's proposed findings but does not contain any objections to respondent's proposed findings. Accordingly, we must conclude that the daughters have conceded respondent's proposed findings of fact as correct except to the extent that the daughters' proposed findings are clearly inconsistent therewith. See Fein v. Commissioner, T.C. Memo. 1994-370 n.1; Estate of Stimson v. Commissioner, T.C. Memo. 1992-242; Cunningham v. Commissioner, T.C. Memo. 1989-260 n.6.

The Northgate Forest Property

During 1979, Parker learned of approximately 440 contiguous acres of undeveloped land (the Northgate Forest property) in a residential area on the northern outskirts of Houston, Harris County, Texas.  Parker retained Houston lawyer Martin Nathan (Nathan) to assist him in the acquisition of the Northgate Forest property.  Acting at Parker's direction, Nathan executed two earnest money contracts (the earnest money contracts) with respect to the Northgate Forest property.  Both contracts were dated July 11, 1979.  One contract was with respect to approximately 362 acres, and provided for a purchase price of $4 million and an earnest money payment to the American Title Co. (American Title) of $20,000; the other was with respect to approximately 75 acres, and provided for a purchase price of $600,000 and an earnest money payment to American Title of $10,000.  Both contracts provided for seller financing and no personal liability of the buyer.  Both contracts showed as purchaser "M. Nathan, his nominees or assigns".  Parker delivered to Nathan checks to be used to make the two earnest money payments to American Title.  Those checks were deposited into Nathan's attorney trust account, and Nathan paid American Title with checks drawn on that attorney trust account.  When presented for collection, Parker's checks to Nathan bounced (were dishonored); Nathan's checks to American Title did not.  A few days later, Nathan told Parker that he (Nathan) wanted out of the

deal and that Parker was to find someone else to put up the money. Parker had told Nathan that he wanted his daughters to have a part of the Northgate Forest property deal.

Parker did not have sufficient credit or financial resources to complete the purchase and proceed with the development of the Northgate Forest property. Both prior to and after execution of the earnest money contracts, Parker searched for investors to contribute to such purchase and development.

The Joint Venture

J. Robert Bradish (Bradish) is an attorney licensed to practice law in California. During the 1960's, Bradish represented Parker. Parker contacted Bradish in his attempts to find investors for the Northgate Forest property. Bradish located Jack Thoner (Thoner), a potential investor. Bradish also loaned Parker $70,000, $30,000 of which Parker used to reimburse Nathan for Parker's bounced checks. Parker negotiated with Thoner concerning a joint venture to develop the Northgate Forest property. By "Joint Venture Agreement" (the joint venture agreement) made between Bradish and Thoner on January 26, 1980, Thoner and Bradish created a joint venture (the joint venture) to acquire, subdivide, and otherwise deal with the Northgate Forest property. At about that time, Nathan assigned the earnest money contracts to Bradish. Simultaneously, Bradish acquired the Northgate Forest property and contributed it to the joint venture. The joint venture agreement provides that Bradish and

Thoner were each to have a 50-percent interest in profits and losses of the joint venture.  Thoner thought of Parker, rather than Bradish, as his partner in the joint venture.  Parker had told Thoner that his children had some interest in the deal Parker and Thoner were negotiating.

By a writing dated January 8, 1980, directed to Betty (the January 8 writing), Bradish described certain aspects of his participation in the potential joint venture between Thoner and Parker (the potential joint venture).  The text of the January 8 writing was dictated by Bradish to Mrs. Bradish in the presence of Parker and Mrs. Betty Parker.  In full, the January 8 writing is as follows:

> Dear Betty Parker:
>
> This is to confirm that J. Robert Bradish holds in trust for Tracey [sic] Parker and Terry Parker 80% of the 50% Venture interest (i.e. 40% of the Venture) which is being negotiated between Jack Thoner and J. Robert Bradish.
>
> In the event J. Robert Bradish dies prior to termination of the Venture, the trustee will be Larry Parker or a person selected by him.
>
> The trust and J. Robert Bradish are obligated to pay Larry Parker a $2,500,000.00 fee upon successful conclusion of his negotiations with Jack Thoner.  The fee is paid as follows:
>
>      1.  The net cash proceeds upon close of escrow from J. Robert Bradish to the Venture.
>      2.  Balance, if any, from the first proceeds due J. Robert Bradish and the trust.
>
> Sincerely,

Consented to and approved:

Elaine Bradish          J. Robert Bradish
January 8, 1980                    1/8/80

Parker and Bradish had agreed that the remaining 20 percent of the Parker 50-percent interest in the potential joint venture (10 percent of the joint venture) would belong to Bradish.

Bradish believed that Parker wished the daughters to have some interest in the joint venture to make good on promises that, previously, he, Parker, had made to Betty to "take care of the kids, put something away for the kids."  Bradish also believed that Parker wanted the daughters to have an interest "from the beginning", that he wanted them to "have their own interests", and that he wanted those interests "protected from him, so he couldn't get his hands on the money."

At or about the time that the January 8 writing was executed by Bradish, Parker and Betty informed Tracy, then 14, and Teresa, then 19, that they had an interest in the potential joint venture.  One or both of Parker and Betty explained to the daughters certain details of the January 8 writing.  They knew that Bradish held their interests.

Disputes and Buyout

By mid-1980, a dispute evolved between (1) Thoner and (2) Bradish and Parker.  That dispute put the future of the joint venture in jeopardy.  The parties to the dispute agreed, however, to modify the joint venture agreement and to settle their differences.  Among other documents, Thoner, Bradish, Parker, and

Betty, entered into a "Joint and Mutual Release". Among other things, that document recites: "Bradish holds a forty percent (40%) interest in the joint venture in trust for the children of Larry and Betty Parker". Among amendments made to the joint venture agreement, (1) Thoner was given exclusive management control over most aspects of the joint venture, (2) an additional joint venture partner, Donald G. Murray, Jr. (Murray), was admitted to the joint venture, with an interest in profits and losses of 10 percent, and (3) Bradish's interest was reduced to 40 percent.

By the end of 1980, disagreements had arisen between Murray, who was on-site manager for the joint venture, and Parker. Thoner and Murray determined to buy out Bradish. Murray undertook negotiations with Parker concerning that buyout. Bradish and Parker also began negotiating concerning the division of the proceeds to be received by Bradish. Among other things, Bradish and Parker disagreed concerning the consequence of the previous reduction in Bradish's interest in the joint venture from 50 percent to 40 percent. Bradish argued that he should receive a share of the proceeds to be received equal to what he would have received had the Bradish interest not been reduced from 50 percent to 40 percent. To end their disagreements, Bradish and Parker agreed to engage an arbitrator. An agreement to arbitrate (the arbitration agreement) was executed on January 4, 1981. The arbitration agreement states that Bradish

holds an interest in the joint venture as trustee for the daughters.  It also states that "Bradish and the Parker children now disagree on the interest each holds in the Joint Venture and have attempted to negotiate a compromise settlement to no avail." The arbitration agreement was executed by Bradish, Parker, Betty, Teresa, and Tracy.  The result of the arbitration agreement was a decision set forth in a letter dated February 23, 1981, from Charles L. Laswell, "Arbitrator".  Neither Parker nor Bradish agreed with that decision.  Negotiations continued between Bradish and Parker and between Parker and Thoner.

By an agreement executed on various dates in March 1981, such agreement entitled "Assignment and Representation and Warranty Agreement" (the assignment agreement), Thoner, Murray, Parker, Bradish, both for himself and as "Trustee", Teresa and certain others agreed that Thoner, Murray, and one John A. Chaky (Chaky) would purchase Bradish's interest (referred to as the "Bradish Group Interest" (Bradish group interest)) in the joint venture.  The assignment agreement states that Bradish holds his interest partially for his account and partially as a trustee. The assignment agreement recites certain consideration to be received in exchange for the Bradish group interest, including $1,600,000 cash, payable to Parker, and two promissory notes, each in the amount of $2 million, and each payable to "R. Bradish, Trustee" (the $2 million notes).

A second, related agreement, entitled "Agreement" (the related agreement), also was executed on various dates in March 1981 by many of the same parties (including Teresa). The related agreement recites that it: "is made as an additional inducement and consideration for the cash payments [$1,600,000] to Parker and promissory notes to Bradish and in recognition that money has been borrowed by Thoner, Murray and Chaky to obtain funds to purchase the Bradish Group Interest." In essence, the related agreement treats the $1,600,000 cash paid to Parker as a loan with respect to which Parker never would repay principal but on which he would pay interest for 4 years. If he defaulted on his obligation to pay interest, then he was obligated to pay liquidated damages. The sole security for those liquidated damages was certain of the notes received pursuant to the assignment agreement, including the $2 million notes.

Bradish endorsed one of the $2 million notes to the order of Teresa, and he endorsed the other to the order of Teresa as custodian for Tracy. The $2 million notes (so endorsed) were received by Parker, who delivered them to Teresa sometime in 1981. Teresa immediately placed the two $2 million notes in her lock box at a bank. Sometime after receiving the $2 million notes, Teresa endorsed to Tracy the one held by her as custodian for Tracy.

The Management Agreement

Sometime in the later part of 1981, Teresa and Parker entered into an agreement whereby Teresa appointed Parker "as manager and consultant investor, to manage and control" the $2 million notes (the management agreement). Parker initiated the management agreement at the time of his divorce from Betty. He was concerned that Betty would convince the daughters to sell the $2 million notes for inadequate sums. Parker never exercised any authority under the management agreement.

The Daughters' 1981 Tax Returns

Teresa made a return of income for 1981 on U.S. Individual Income Tax Return, Form 1040 (Teresa's 1981 return). Attached to Teresa's 1981 return is Form 6252, Computation of Installment Sale Income (Form 6252). Form 6252 reported the installment sale of certain real property. The description of that real property is identical with the description of the Northgate Forest property, as described in the assignment agreement. That real property is reported to have been acquired on January 26, 1980, and to have been sold on March 4, 1981. The stated selling price is reported to be $2 million, to be paid 4 years after March 4, 1981, with no interest.

Tracy did not file a tax return for 1981.

Suit and Settlement

In 1985, when the $2 million notes and certain other notes described in the related agreement were not paid by the makers

thereof--Thoner, Murray, and Chaky (the makers)--a suit was instigated to force payment (the lawsuit).  The lawsuit was settled pursuant to a document entitled "Compromise and Settlement Agreement, Indemnity  Agreement, and Release in Full" (the settlement agreement).  Both Teresa and Tracy executed the settlement agreement.  In pertinent part, the settlement agreement provides as follows:  The makers shall pay $1,700,000 to Teresa and the same amount to Tracy and shall convey to each certain real property; the $2 million notes shall be delivered to the makers; each of the daughters represents that she "is the sole owner and holder of said promissory note, and that she has not assigned (collaterally or absolutely), pledged or hypothecated said promissory note".

Following execution of the settlement agreement, Tracy wrote in her own handwriting on the face of the $2 million note endorsed to her:

> Paid in full by cashier's check #202259
> drawn on Allied Champions Bank
> /s/ Tracy C. Parker

Tracy received a check for $1.7 million upon signing and surrendering the note.  Likewise, following execution of the settlement agreement, Teresa wrote in her own handwriting on the face of the $2 million note endorsed to her:


> Paid in full by cashier's check #202260
> drawn on Allied Champions Bank.
> /s/ Terry Parker Davis

Teresa received a check for $1,700,000 upon signing and surrendering her note.

At or about the time of the settlement of the lawsuit, Northgate Forest Development Corp. executed and delivered a warranty deed conveying two lots in the Northgate Forest subdivision to Tracy and a second warranty deed conveying another two lots to Teresa.

OPINION

I. Deficiencies

A. Introduction

Respondent has determined inconsistent deficiencies in income tax against both the Parkers and the daughters. She asks the Court to determine who, as between the Parkers and the daughters, is properly taxable with respect to the proceeds of certain notes (the $2 million notes). There is no question that the proceeds of the $2 million notes ended up in the hands of the daughters, and that that happened as a result of certain gifts made to them by Parker. We must, however, determine when those gifts occurred. Put another way, we must determine who, as between Parker and the daughters, owned the $2 million notes for Federal income tax purposes at the time the notes were paid.

The Parkers argue that Parker made gifts to the daughters either (1) before or at the time that the joint venture was created in 1980 or (2) when the Bradish group interest in the joint venture was sold in 1981, and the $2 million notes were

received.  In either case, the Parkers argue, the daughters owned the $2 million notes when they were paid.  The daughters, on the other hand, argue that Parker owned the $2 million notes at all times and made no gifts to them until after he received the proceeds therefrom.

B.  State Law Controls

With respect to income realized upon the payment of notes, as with respect to other income, Federal income tax liability follows ownership.  See United State v. Mitchell, 403 U.S. 190, 197 (1971) ("with respect to community income, as with respect to other income, federal income tax liability follows ownership."). "In the determination of ownership, state law controls.  The state law creates legal interests but the federal statute determines when and how they shall be taxed."  Id. (internal quotation marks and citations omitted).  We examine Texas law to determine who owned the $2 million notes when they were paid. That requires that we determine the nature and timing of Parker's gifts.

C.  Elements of a Gift

> Three elements are necessary to establish the existence of a gift:  (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property.  * * *  The intent of the donor, however, is the principal issue in determining whether a gift has been made.  * * *

In re Estate of Hamill, 866 S.W.2d 339, 344 (Tex. Ct. App. 1993).

D.  The Gifts

    1.  Nature and Timing of the Gifts; Consequences

We find that Parker made gifts to the daughters no later than January 26, 1980, of some or all of his rights under the earnest money contracts.  The rights of the daughters in the property subject to the earnest money contracts (the Northgate Forest property) were contributed to the joint venture in consideration of a 40-percent interest in the joint venture, as reflected in the January 8 writing.  The $2 million notes received by the daughters were in consideration of their interests in the joint venture.  The daughters owned the $2 million notes at the time of their redemption in 1985 and, therefore, are taxable on the proceeds of those notes.  Parker is not taxable on those proceeds.

    2.  Intent to Make a Gift

    "[T]he intent of the donor * * * is the principal issue in determining whether a gift has been made."  Id. at 344.

    There is substantial evidence supporting the conclusion that, sometime before the joint venture was formed on January 26, 1980, Parker formed the intent to make gifts to the daughters, and we so find.  Parker told both Nathan and Thoner that the daughters had some part of the Northgate Forest property deal. Bradish certainly understood that, as evidenced by the January 8 writing.  Indeed, Bradish dictated to Mrs. Bradish the terms of the January 8 writing.  At or about the time of the January 8

writing, Parker and Betty informed the daughters of their interests in the potential joint venture. Parker's actions subsequent to January 26, 1980, are consistent with the conclusion that he made a gift to the daughters on or before that date. For example, the Joint and Mutual release entered into by Parker, Bradish, and others recites that "Bradish holds a forty percent (40%) interest in the joint venture in trust for the children of Larry and Betty Parker".

     3.  Delivery

"It has long been the rule in Texas that for a gift to be effective, title to the item must pass immediately and unconditionally and the transfer thereof must be so complete that the donee might maintain an action for the conversion of the property." Oadra v. Stegall, 871 S.W.2d. 882, 890 (Tex. Ct. App. 1994) (internal quotation marks and citations omitted).

Parker never owned the Northgate Forest property. Acting at Parker's direction, Nathan entered into the earnest money contracts, which accorded Nathan, "his nominees or assigns", as "Purchaser", certain time-sensitive rights to complete the purchase of the Northgate Forest property. The earnest money contracts were assigned to Bradish, who completed the purchase of the Northgate Forest property and contributed that property to the joint venture. Albeit with borrowed funds, Parker made the escrow payments required under the earnest money contracts. We are satisfied that, in making those payments, Parker made a gift

to the daughters.  Because Nathan was working at Parker's direction, and only Nathan's name appears as purchaser on the earnest money contracts, it is unclear just how much of an interest in the contracts the daughters had received as a result of Parker's gift.  The joint venture agreement, when read together with the January 8 writing, however, makes it clear just how much of a gift Parker had made to the daughters.  Clearly, as stated in the January 8 writing, Parker had retained the right to a substantial cash payment (fee).  In Cox v. Windham, 10 S.W.2d 136, 139 (Tex. Civ. App. 1928) the court stated:  "It is settled law that where property is delivered to a third person under conditions indicating the donor intended to make an effective gift, it will be so treated".  The court also stated a further rule: "that delivery of personal property is not so strictly applied to transactions between members of a family residing in the same house, as is applied to transactions between strangers."  Id.; see also Bishop v. Bishop, 359 S.W.2d 869, 871 (Tex. 1962) (citing with approval Cox v. Windham, supra).  In the Bishop case, in the context of a divorce action, the Texas Supreme Court dealt with the ex-wife's claim that, while she was married to her ex-husband, he had told her that certain household furniture was hers, even though it remained in the house occupied by both of them.  The court stated:  "Texas is one of the jurisdictions holding that statements by the donor indicating that he had given the chattel to the donee are sufficient to raise an issue of fact

as to whether there was a delivery."  Id.  In Lord v. New York Life Ins. Co., 66 S.W. 290 (Tex. 1902), the Supreme Court of Texas dealt with a deceased donor's declaration that an insurance policy payable to his estate, at his death, in the possession of a third party, was for his sister.  The question before the court was whether such declaration was sufficient evidence on which to base a finding of delivery of the insurance policy to her.  The court stated:  "We see no reason why the fact of delivery could not be as well proved by a declaration as the fact of gift itself, or any other fact about which a party had made a declaration against his own interest."  Id. at 292; see also Estate of Bridges v. Mosebrook, 662 S.W.2d 116, 121 (Tex. Ct. App. 1983) (with regard to delivery of certificates of stock: "Actual delivery is not always necessary; rather, where the circumstances make actual delivery impractical, delivery may be symbolical or constructive."); Webb v. Webb, 184 S.W.2d 153, 156 (Tex. Civ. App. 1944) (similar).  The fact of delivery of an interest in a chose in action, such as Parker obtained by way of the earnest money contracts, can be proved by declarations alone. We believe that Parker's declarations to Nathan, Thoner, and Bradish, as manifest in the January 8 writing are proof of delivery of a gift to the daughters before the joint venture was entered into, and we so find.

#### 4. Acceptance

> An infant is capable of being a donee of property, and when the gift is to his advantage a formal acceptance is not necessary, since the law implies an acceptance, but if the gift is not to his advantage, or becomes a burden to him before he becomes sui juris, the law implies a repudiation.  * * *

Austin v. Burden, 297 S.W. 648, 651 (Tex. Civ. App. 1927);

McMillian v. United States, 24 AFTR2d 69-5699, 69-2 USTC par.

9633 (N.D. Tex. 1969) (similar).

The daughters argue that they accepted no gifts from Parker until they received the proceeds of the $2 million notes from him in 1985.  We disagree.  Parker made gifts to the daughters no later than January 26, 1980, which, even if they did not signify formal acceptance, they are deemed to have accepted.  Parker's gifts were to the daughters' advantage; the gifts resulted in each of the daughters receiving $1,700,000 in cash and valuable real estate.  No repudiation may be implied.  Moreover, there is substantial evidence that, from about January 8, 1980, the daughters were aware of the gifts and acknowledged their receipt. Parker and Betty both informed the daughters about the potential joint venture, and one or both of Parker and Betty explained to the daughters some details of the January 8 writing.  The daughters executed the arbitration agreement.  Teresa executed both the assignment agreement and the related agreement.  Teresa received both of the $2 million notes in 1981, and endorsed one to Tracy sometime thereafter.  Teresa filed a Federal income tax

return for 1981 that reported an installment sale of the Northgate Forest property in 1981 and stated that the property had been acquired on January 26, 1980. Teresa and Tracy both executed the settlement agreement. Each wrote on the face of one of the $2 million notes "Paid in full". All of those actions are inconsistent with the daughters' theory that Parker received the proceeds of the $2 million notes and then made gifts to the daughters. We find that the daughters accepted gifts from Parker no later than January 26, 1980.

    5.   <u>Other Considerations</u>

    a.   <u>Bradish's Independence</u>

The daughters argue strenuously that Bradish was no more than Parker's tool, and, for that reason, Parker did not give up dominion and control over anything until he (Parker) made a gift to the daughters of the proceeds of the $2 million notes. We do not agree. The January 8 writing is evidence of Parker's, and Bradish's, concern that the daughters' interest in the potential joint venture be differentiated from Parker's and Bradish's interests. Witness Bradish's testimony with regard to the meaning of the expression "holds in trust for Tracey [sic] Parker and Terry Parker" in the January 8, writing:

    Q    Will you state the meaning that you intended,
    please, with the selection of those words?

    A    Well, you know, at the deposition, I mean, we
    talked about guardian, age and trust. My -- assuming
    there was no document and I had died, the kids would

have been able to enforce a constructive trust against my estate, I would think.

Q    the kids meaning --

A    Being the Parker children.

Q    Yes.

A    And Larry, to the extent he had any interest --

Q    Yes.

A    -- against my estate, if my estate tried to claim the entire property through those agreements or contracts that I acquired from Marty Nathan.

And so, I felt that I held the bare legal title to this entity, the land and then the ultimate entity, and held it subject to the Parker children's ownership, and Larry Parker's rights.

Larry Parker having $2.5 million, and the children having an interest in this joint venture we were putting together.

Q    The concept, trust, here, had no meaning beyond that?

A    I didn't think of it as that.  I am holding title for the kids.  I am just holding title.  And that is my feeling.

Bradish further testified about the period from January 1980 until March 1981, when the Bradish group interest was sold and the $2 million notes were received.  He testified that he acted independently of Parker.  He testified that he was looking out for the best interests of the daughters and himself.  He testified that, "absolutely", he had the authority to act independently of Parker.  We found Bradish to be a credible witness.  We find that he acted independently of Parker.  We

believe that Bradish carried out what he testified were his instructions from Parker:  "My instructions were to take title to the property, for the girls, and Parker was not to get his hands on their money as it came down the pike.  That was what the instructions were to me."

### b.  Management Agreement

The management agreement gave Parker certain rights with respect to the $2 million notes.  The daughters argue that the management agreement indicates that Parker had dominion and control over the $2 million notes and, thus, had never completed a gift to the daughters.  We disagree.  In fact, the management agreement signifies to us that Parker had not retained dominion and control over the $2 million notes.  If he had, he would not have needed the management agreement.  We accept Parker's explanation that the management agreement resulted from his divorce from Betty and from his concern that the daughters would be persuaded to sell the notes for inadequate consideration.

### c.  Related Agreement

The related agreement put the $2 million notes at risk for Parker's interest obligation under that agreement.  The daughters argue that such risk shows that Parker controlled the $2 million notes.  We disagree.  Clearly, the daughters bore some risk of Parker's default.  Theoretically, Parker's default could have eliminated all of their equity in the $2 million notes, because the related agreement contained a five-fold penalty clause

(penalty equal to five times the interest not paid).  We assume that the daughters could have avoided that penalty by making good on Parker's default.  The exposure of the $2 million notes under the related agreement goes to the value of the notes, not to their ownership.  In any event, the daughters received substantial compensation for the $2 million notes.  Also, we have found that Parker's gift to the daughters was made in 1980, not in 1985.

### d.  Credibility

We have found that Parker made gifts to the daughters in 1980 based on our analysis of those elements (intent, delivery, and acceptance) necessary to establish a gift under the law of Texas.  Necessarily, we have rejected the daughters' proposed finding that Parker made no gifts to them until 1985, after he received the proceeds of the $2 million notes.  In finding gifts in 1980, and not thereafter, we have taken into account the testimony of Parker, the daughters, and others.  We found Parker to be a credible witness.  His testimony was straightforward and consistent with other evidence.  We have given great weight to his testimony.  We did not find the daughters to be credible witnesses.  Teresa did not offer oral testimony, but her testimony was offered by deposition and affidavit.  She also answered interrogatories.  There are significant inconsistencies between (1) her testimony and her answers to interrogatories and (2) other evidence in this case.  We believe that, in various

important respects, Teresa has failed to tell the truth.  For example, we believe that, with respect to her dealings with the Internal Revenue Service in 1986, she has failed to tell the truth.  Accordingly, we have accorded Teresa's testimony and answers little weight.  Cf. Gerardo v. Commissioner, 552 F.2d 549, 553 (3d Cir. 1977), affg. in part and revg. in part T.C. Memo. 1975-341, (Tax Court need not give credence to testimony that it disbelieves).  Tracy did testify orally.  In important respects, her testimony was vague and indefinite.  She was contradicted by other witnesses.  We do not have much confidence in her testimony, and, accordingly, we give it little weight.

E.  Conclusions

We have concluded that the daughters are taxable on the proceeds of the $2 million notes and that Parker is not.  See supra sec. I.D.1.  That conclusion is based on our finding that Parker made gifts to the daughters no later than January 26, 1980, of some or all of his rights under the earnest money contracts.  Id.  The daughters have argued that there were no gifts in 1980.  They have not, however, argued that, if we were to find gifts in 1980, respondent's adjustments for 1985 increasing each daughter's taxable income by $725,188 otherwise were in error.  Accordingly, we believe that the daughters have conceded the amounts of taxable income that result from our finding that Parker made gifts to them no later than January 26, 1980.  We so find.

## II. Additions to Tax

### A. Parkers

Respondent determined additions to tax under sections 6653(a)(1) and (2) and 6661 against the Parkers. We have granted partial summary judgment in favor of the Parkers with respect to one aspect of the deficiency in tax determined against them for 1985, and we have here determined that no gain is recognized to the Parkers on account of the $2 million notes. We believe that we have thus resolved favorably to the Parkers all assignments of error as to deficiencies raised by them in the petition and that, as a result, we must redetermine a deficiency of zero for 1985. We are somewhat confused, however, by one item, in the amount of $1,600,000, described in the stipulation of settled issues as "cancellation of debt income", and added to respondent's determination of unreported long-term capital gain. In respondent's brief, that $1,600,000 item is described as long-term capital gain reported by the Parkers "from the sale of the joint venture interest". It is further described as an adjustment respondent was unable to take into consideration in the notice of deficiency mailed to the Parkers. Whatever that item is, and if it gives rise to any increased deficiency (which we doubt), respondent has failed to carry her burden of proof as to any necessary facts, and we shall treat respondent as having abandoned any basis for a deficiency other than those that we have dealt with here or in our order disposing of the Parkers'

motion for summary judgment.  Therefore, having redetermined a deficiency of zero, respondent's additions to tax must fail, and we so hold.

B.  The Daughters

Respondent determined additions to tax under sections 6653(a)(1) and (2) and 6661 against each of the daughters.

Section 6653(a)(1) provides that, if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.  Section 6653(a)(2) imposes a separate addition to tax, equal to 50 percent of the interest payable under section 6601, on the portion of the underpayment that is attributable to the negligence of the taxpayer.  For purposes of section 6653(a), negligence is defined as the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement.  An understatement is "substantial" when the understatement for the taxable year exceeds the greater of (1) 10 percent of the tax required to be shown or (2) $5,000. The understatement is reduced to the extent that the taxpayer

has (1) adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item. Sec. 6661; sec. 1.6661-6(a), Income Tax Regs.

The daughters bear the burden of proof with regard to the additions to tax determined by respondent. Rule 142(a).

In their petitions, both of the daughters assign error to respondent's determinations of additions to tax under sections 6653(a) and 6661. Neither of the daughters, however, specifically avers any facts in support of those assignments of errors. On brief, the daughters propose no findings of fact specifically relating to the additions to tax, nor do they set forth any arguments with regard to the additions to tax. We assume that, in defense to respondent's determinations of additions to tax, the daughters rely exclusively on our determining no deficiencies in tax liability. We have determined such deficiencies. The daughters have failed to carry their burdens of proof. Respondent's determinations of additions to tax with respect to the daughters are sustained.

Decisions will be entered for respondent in docket Nos. 345-92 and 352-92.

Decision will be entered for petitioners in docket No. 900-92.