Horn, Appellant, vs. Horn, Respondent.

*January 31—February 18, 1913.*

*Executors and administrators: Title to property inventoried: Gifts*
*inter vivos: Parent and child: What delivery necessary: In-*
*tention to pass title: Evidence.*

1. The evidence in this case (stated in the opinion) is *held* to show
   that a son was the owner of certain personal property inven-
   toried as a part of his father's estate.
2. While the relationship of parent and child requires close scru-
   tiny of the evidence of transfer of property by way of gift, yet
   when a gift is clearly shown by the evidence it becomes ir-
   revocable.
3. What delivery is necessary to transfer the title to property as
   a gift *inter vivos* depends upon the nature of the property and
   the situation of the parties at the time.
4. A delivery of horses by a bedridden father to his son, who alone
   had remained with him, working and attending to his farming
   business, after his other children had married and left the
   home, required no act from the father aside from his declara-
   tion that he then gave them to the son and surrendered do-
   minion over them, and aside from his regarding them there-
   after as the property of his son.
5. The intention of the father in such case to pass the title to the
   son is shown by his subsequent conduct in claiming no right
   of dominion over the horses and in permitting the son to handle
   and dispose of them as his individual property.

APPEAL from a judgment of the circuit court for Wash-
ington county: MARTIN L. LUECK, Circuit Judge. *Reversed.*

This is an appeal from that part of a judgment of the cir-
cuit court for Washington county which reverses an order of
the Washington county court, under which certain personal
property in the inventory of the administrator of the estate
of Frederick Horn, deceased, was stricken therefrom on the
ground that it was not the property of the deceased.

For the appellant the cause was submitted on the brief of
*Sawyer & Sawyer.*

For the respondent there was a brief by *William F.*
*Schanen,* and oral argument by *Douglas Van Dyke.*

SIEBECKER, J.   Frederick Horn died June 2, 1907, on his farm in Washington county, leaving seven sons and daughters as his sole heirs at law and legatees.   His wife had died in 1897.   For about thirty years prior to his death he had been a paralytic and was unable to do manual labor.   During the last years of his illness he occupied his bedroom on the second floor of his home, being brought downstairs and out of the house only a few times a year.   His sons had lived at home and worked on his farms until they married.   At the time of his death his children, with the exception of *Louis,* the youngest, had all married and left the home.   After the marriage of his brother Charles in 1899, *Louis,* alone of the children, worked upon and managed the two farms owned and retained by his father.

By the will of Frederick Horn the homestead farm of seventy acres, valued at $7,000, was given to the son *Louis* absolutely.   The will provided for the payment of the debts, funeral expenses, and the expense of a monument out of the personal property, if it should be sufficient.   If the personal property should be more than sufficient to pay these items, the balance was to be divided equally among the children.   A forty-acre tract of land belonging to Frederick Horn was devised to *Louis,* charged with the payment of $2,000 to the children.   If the personal property left by the deceased should be insufficient to pay the debts, funeral expenses, and the expense of a monument, then the additional amount needed for these purposes was to be paid out of the $2,000 charged upon the forty acres devised to *Louis,* and the balance thereof, after payment of $650 specifically devised, was to be divided equally between the seven children of the deceased.

The administrator included in his inventory all of the personal property found on the farm of the deceased.   This personal property was appraised at $1,503.   *Louis* claimed that some of this personal property belonged to him and petitioned the county court to strike the articles claimed by him from

the inventory.    After a hearing on the petition the county
court ordered property claimed by *Louis* and appraised at
$1,015 to be stricken from the inventory.    *William Horn,*
the eldest son of the deceased, alone appealed from this order
of the county court.

A granddaughter of the deceased, who lived with and kept
house for him from the time his wife died in 1897 to the time
of his death, testified in circuit court that on an occasion
shortly after the marriage of the son Charles, just after
Charles and the son *Louis* had been with the deceased in his
room upstairs, she carried up a lunch to her grandfather, and
her grandfather then told that he had divided the horses
on the farm with his two sons, that he had retained two colts,
Charlie had taken three bay horses, and that *Louis* had what
was left, two old mares and the bay colt.    She testified that
she knew that her grandfather had sold the two colts retained
by him and that he told inquiring prospective purchasers of
horses that they belonged to *Louis*.    She also testified that
she had seen the horses given to Charles on Charles's farm,
that she knew of *Louis* buying a platform spring wagon, that
sometimes her grandfather and sometimes *Louis* paid the
bills on the farm, that *Louis* bought and sold the grain and
cattle on the farm and did what was required to run the farm
affairs.

Henry Leverenz, who had worked on the farm of the de-
ceased for four years, testified that the deceased had told him
that there had been a division of the horses between him and
his sons.

*Louis Horn* testified that a broncho gelding which was on
the farm at the time of his father's death had been purchased
by him, that he borrowed the money to pay for him from his
sister, gave her his note for the amount borrowed and after-
ward paid the amount, and that the note was not signed by
his father.    The vendor of the horse testified that he had sold
the horse to *Louis* and that *Louis* paid him for the horse.

The sister of *Louis* testified that she had loaned this money to *Louis,* as he testified.  *Louis* also testified that the black brood mare which was included in the inventory of the administrator of his father's estate, with $410, was the consideration given him for a span of sorrels which were bred by him from one of the mares received by him from his father, and that all of the other horses and colts included in the inventory were bred by him either from the mares received by him from his father or from the mare he had received in trade for the span of sorrels.

There is evidence in the case that Frederick Horn stated to an employee that the horses on the farm belonged to *Louis;* to a grandson that all the horses with one exception, called "Diamond," belonged to *Louis;* and to the owner of a factory near the farm, referring to "Diamond," that that was the only horse he owned.  *Louis* also testified that he had sold two colts to the husband of a niece and took a note for them. The husband of this niece testified that he had purchased the colts from *Louis* and gave his note for the purchase price, that when he went to pay the note *Louis* was not at home, and that when he told Frederick Horn what he wanted, Frederick Horn told him he could leave the money there.

There was evidence that Frederick Horn had a tin box in which he kept his will, valuable papers, and money; that *Louis Horn* had free access to this box; and that the contents of Frederick Horn's will were known to his family from the time of its execution on November 9, 1899.

*Louis Horn's* evidence concerning the disc harrow included in the inventory is that he obtained it in exchange for the horse he purchased with money borrowed from his sister; that the seeder claimed by him was paid for with the money obtained from the sale of the sorrel team; and that the platform spring wagon had been paid for with money obtained from the husband of his niece by the sale of two colts to him. The harrow, the seeder, the wagon, and the horses are the

items stricken from the inventory by the order of the county court.

There is evidence that the personal property in dispute in this case was assessed for taxes against Frederick Horn, that the assessor filled out the assessment blanks with Frederick Horn's assistance, and that *Louis Horn* had referred the assessor to his father for information thereon. There was also evidence that bills for horseshoeing were, at *Louis Horn's* request, paid by his father.

It also appears that the children of Frederick Horn upon marrying had been given gifts of money and property by their father; that *William Horn* had received a deed to 166 acres of land from his father upon his marriage, that Charles Horn had received a deed to 117 acres of land from his father at the time of his marriage, and that the other children, except *Louis*, who was not married, had all received gifts of money from their father.

The circuit court found that Frederick Horn had not made the gift to *Louis Horn* of the mares and the colt claimed by him, and that all of the personal property included in the inventory of the administrator belonged to the estate of Frederick Horn, and entered an order reversing that part of the order of the county court striking out from the inventory the items of personal property which the county court had found to be the property of *Louis Horn.*

The foregoing statement contains the evidence of the witnesses who had personal knowledge of the declarations of the deceased and of the facts and circumstances showing the relations of the deceased and his son *Louis* and the way they conducted their affairs on the farm. There is no direct evidence contradicting this evidence. The contention is that the evidence adduced clearly preponderates to show and establish the fact that the deceased made a division and transfer of the personal property on his farm at the time Charles married and left his father's place and that the deceased then

gave *Louis* the horses he claims. It is without dispute that the sons Charles and *Louis* had remained with their father, performed the labor, and attended to his farming business. It is also clearly shown that the father, from gratitude and affection and in consideration of their services, made a disposition of his stock by dividing it among these two sons, he retaining two colts. This transaction is of importance in explaining their subsequent conduct and in aiding us to ascertain the intention of the parties. *Louis* alone remained with his father after Charles removed from the parental home, and he continued on the farm until his father's death. Under these circumstances a delivery of the horses to *Louis* required no act from the father aside from his declaration that he then gave them to *Louis* and surrendered dominion over them, and aside from his regarding them thereafter as the property of *Louis*. The intention of the father to pass title thereto to *Louis* is clearly shown by his subsequent conduct in claiming no right or dominion over them and in permitting *Louis* to handle and dispose of them as his individual property. *Louis'* treatment of them from this time, in all its details, is entirely consistent with his claim of ownership. The circumstances relied on as showing a contrary intent are of no material weight as against the positive statements of the witnesses and the subsequent conduct of the parties through a long course of years. The evidence and all the reasonable inferences therefrom tend to sustain *Louis Horn's* claim that he owned the property, as the county court found, and the finding of the circuit court on this question is clearly wrong and must be reversed. The question of the delivery of this property and the transfer thereof is controlled by the nature of the property and the situation of the parties at the time. While the relationship of parent and child requires close scrutiny of the evidence of transfer of property by way of gift, yet when it is clearly shown by evidence it becomes irrevocable. *Kellogg v. Adams,* 51 Wis. 138, 8 N. W. 115;

*Second Nat. Bank v. Merrill,* 81 Wis. 142, 50 N. W. 503; *Williams v. Hoehle,* 95 Wis. 510, 70 N. W. 556.

*By the Court.*—That part of the judgment appealed from is reversed, and the cause remanded to the circuit court with directions to enter a judgment affirming the order of the county court from which respondent appealed to the circuit court, and for costs to the respondent in said circuit court.