# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2019AP1084

†Petition for Review filed

Complete Title of Case:

IN RE THE ESTATE OF DAVID F. OAKS:

THE ESTATE OF DAVID F. OAKS, BY ITS PERSONAL REPRESENTATIVE CHERI R. WARDELL,

†APPELLANT-CROSS-RESPONDENT,

V.

LYNNE STOUFF,

RESPONDENT-CROSS-APPELLANT.

| | |
|---|---|
| Opinion Filed: | April 28, 2020 |
| Submitted on Briefs: | February 25, 2020 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the appellant-cross-respondent, the cause was submitted on the briefs of *Curtiss N. Lein* of *Lein Law Offices*, Hayward. |
| Respondent ATTORNEYS: | On behalf of the respondent-cross-appellant, the cause was submitted on the brief of *William Bratcher* of *Bratcher Law Office, LLC*, Thorp. |

COURT OF APPEALS
DECISION
DATED AND FILED

April 28, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1084**

Cir. Ct. No. 2018PR48

STATE OF WISCONSIN

IN COURT OF APPEALS

IN RE THE ESTATE OF DAVID F. OAKS:

THE ESTATE OF DAVID F. OAKS, BY ITS PERSONAL REPRESENTATIVE CHERI R. WARDELL,

   APPELLANT-CROSS-RESPONDENT,

 V.

LYNNE STOUFF,

   RESPONDENT-CROSS-APPELLANT.

APPEAL and CROSS-APPEAL from an order of the circuit court for Chippewa County: STEVEN H. GIBBS, Judge. *Modified and, as modified, affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 STARK, P.J. Shortly before he died by suicide, David Oaks wrote a note giving all of his "worldly belongings" to Lynne Stouff, his longtime romantic partner. Based on that note, the circuit court awarded Oaks' entire estate to Stouff, pursuant to the doctrine of gift causa mortis.[1] On appeal, Oaks' estate ("the Estate") argues the court erred because a gift causa mortis can never occur when the donor dies by suicide. The Estate also argues Stouff failed to establish that the property in question was delivered to her, as required for a gift causa mortis. In addition, the Estate argues the court erred by ordering it to reimburse Stouff for $4287.51 in expenses that she claimed to have paid on the Estate's behalf.

¶2 We reject the Estate's argument that a gift causa mortis can never occur in the context of a donor's suicide. While a gift made in anticipation of a donor's suicide may not always qualify as a gift causa mortis, the doctrine applies in this case, where the undisputed facts show that Oaks' suicide was the result of a present mental illness. We also reject the Estate's argument that Stouff failed to establish that the property in question was delivered to her. Accordingly, we affirm the circuit court's grant of summary judgment on Stouff's claim under the doctrine of gift causa mortis.

¶3 We also reject the Estate's argument that the circuit court erred by granting Stouff summary judgment on her expense reimbursement claim. It appears, however, that the court made a mathematical error when calculating the amount of Stouff's claimed expenses. The court determined Stouff was entitled to recover all of her claimed expenses, but it incorrectly determined that those

---

[1] The term "gift causa mortis" refers to a "gift made in contemplation of the donor's imminent death." *Gift causa mortis*, BLACK'S LAW DICTIONARY (11th ed. 2019).

expenses totaled $4287.51, rather than $4760.51. We therefore modify the court's order to award Stouff $4760.51 in expenses and, as modified, affirm.[2]

## BACKGROUND

¶4      Stouff and Oaks were in a romantic relationship for over twenty-three years—from February 1995 until Oaks' death on March 8, 2018. They never married, but they lived together for approximately ten years—from 2008 until Oaks' death. Oaks had been divorced twice and had an adult daughter, Cheri Wardell, who was not Stouff's offspring. It is undisputed that Oaks and Wardell did not have a "close relationship" and were "estranged for many years" prior to Oaks' death.

¶5      In the early morning hours of March 8, 2018, Oaks fatally shot himself in the head in the home he shared with Stouff, while Stouff was asleep upstairs. Stouff woke when she heard a loud bang, and when she went downstairs to investigate, she found two handwritten notes on a table. The first note read:

3-7-18

> Lynne Stouff has been my companion and my crutch for a long while.
>
> As I leave this existence I want all worldly belongings to be assigned to Lynne.

David Oaks

The second note read:

> Lynne—

---

[2] Stouff cross-appeals, arguing the circuit court erred by denying her motion for default judgment. Because we affirm on each of the issues raised in the Estate's appeal, we need not address Stouff's cross-appeal. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals decides cases on the narrowest possible grounds).

This is all I can go with this—Thank you for being there for me all these years.

I love you.

¶6      It is undisputed that Oaks died intestate—that is, without a valid will. *See Intestate*, BLACK'S LAW DICTIONARY (11th ed. 2019).  It is further undisputed that Oaks died unmarried and that Wardell was his only child.  As such, Oaks' entire estate would normally pass to Wardell under the general rules of intestate succession, as set forth in WIS. STAT. § 852.01 (2017-18).[3]

¶7      Wardell filed a petition for formal administration of Oaks' estate on May 23, 2018.  An order for formal administration was issued two days later, and Wardell was named the Estate's personal representative.  Stouff subsequently filed several claims against the Estate.  As relevant to this appeal, Stouff contended she was entitled to Oaks' entire estate under the doctrine of gift causa mortis based on the first note Oaks left before he died.  Stouff also alleged the Estate was required to reimburse her for $4760.51 in payments she had made on behalf of the Estate, comprised of:  (1) a $100 payment she made toward the balance owing on one of Oaks' credit cards; (2) premium payments totaling $373 for insurance on Oaks' property; and (3) payments totaling $4284.51 for funeral expenses.

¶8      The Estate denied Stouff's claim for the entirety of Oaks' estate based on the doctrine of gift causa mortis.  As for Stouff's claim for reimbursement, the Estate agreed to reimburse Stouff for cremation expenses in the amount of $2267, but it refused to reimburse her for the rest of her claimed expenses.

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶9     Stouff subsequently moved for summary judgment on her claims against the Estate. In support of her motion, she submitted her own affidavit and her attorney's affidavit, both of which included attached exhibits. The Estate filed its own motion for summary judgment on Stouff's claims and also filed a brief in response to Stouff's summary judgment motion. The Estate did not, however, submit any affidavits either in support of its own summary judgment motion or in opposition to Stouff's motion.

¶10     The circuit court ultimately issued a written decision granting Stouff's summary judgment motion and denying the Estate's motion. Based upon the undisputed facts, the court determined Stouff had established each of the elements of a gift causa mortis, and she was therefore entitled to the entirety of Oaks' estate. The court also determined Stouff was entitled to reimbursement from the Estate for all of her claimed expenses. However, the court awarded Stouff only $4287.51 in expenses, rather than the $4760.51 she had claimed. The Estate now appeals, arguing the court erred by granting Stouff's summary judgment motion.

## DISCUSSION

¶11     We review a grant of summary judgment independently, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Under that methodology, we examine the moving party's submissions to determine whether they establish a prima facie case for summary judgment. *Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983). If the moving party has made a prima facie showing, we examine the opposing party's affidavits to determine whether a genuine issue exists as to any material fact. *Id.* Ultimately, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶12 Here, the circuit court determined Stouff was entitled to summary judgment on both her claim for Oaks' entire estate under the doctrine of gift causa mortis and on her claim seeking reimbursement for certain expenses. We address each of those claims below.

## I. Gift causa mortis

¶13 "The general rule is that a testamentary disposition (a disposition that takes effect upon the death of the person making the disposition) must comply with the statutory requirements for the execution of wills." *Meegan v. Netzer*, 2012 WI App 20, ¶9, 339 Wis. 2d 460, 810 N.W.2d 358. However, a gift causa mortis operates as an exception to that general rule. *Id.* Under the doctrine of gift causa mortis, "a gift made during the life of the donor becomes effective upon the donor's death if certain requirements are met." *Id.*, ¶1. Specifically, in order to establish a gift causa mortis, a claimant must prove that: (1) the donor had an intention to make a gift effective at death; (2) the donor made the gift "with a view to the donor's death from present illness or from an external and apprehended peril"; (3) the donor died of that ailment or peril; and (4) there was a delivery of the gifted property. *Id.*, ¶10 (citation omitted).

¶14 On appeal, the Estate argues the circuit court erred by concluding Stouff satisfied the second and third requirements for a gift causa mortis because Oaks did not gift his property to Stouff in anticipation of his own death from a present illness or external peril, nor did he ultimately die from a present illness or external peril. The Estate also argues Stouff failed to satisfy the fourth requirement

6

for a gift causa mortis because the gifted property was not delivered to Stouff. We address these arguments in turn.

### A. Death from a present illness or external peril

¶15 The Estate argues that Stouff cannot meet the second and third requirements for a gift causa mortis. It concedes Stouff can prove that Oaks gifted property to her in anticipation of his death. However, the Estate argues Stouff cannot prove Oaks gifted that property in anticipation of his death from a present illness or external peril because suicide is not a present illness or external peril. Further, because Oaks died as a result of suicide, the Estate argues he did not die from a present illness or external peril. For these reasons, the Estate contends a gift causa mortis can never occur in the context of a donor's suicide.

¶16 While the Estate concedes that no Wisconsin case to date has addressed this issue, it asserts that "[h]istorically, the common law has maintained that a gift causa mortis made in contemplation of the donor's suicide is void." The Estate further contends that various other jurisdictions have followed this historical rule and have held that "death by suicide does not satisfy the requirement that a gift be made in expectation of imminent death from illness or impending peril."

¶17 We do not find the Estate's argument in this regard persuasive. In making its argument, the Estate fails to distinguish between the manner of a donor's death and the ultimate cause of the donor's death. While the manner of death may be suicide, that suicide may, in some cases, have been caused by a present mental illness—for instance, depression. Accordingly, even in a case in which the donor died by suicide, a party may be able to show that the donor made a gift in expectation of his or her death from a present mental illness, and that the present mental illness caused the donor's death. Thus, contrary to the Estate's contention, the fact that a

donor died by suicide does not automatically prevent a party from establishing that the donor made a gift causa mortis.

¶18 In support of its argument to the contrary, the Estate relies primarily on two cases from other jurisdictions—*Ray v. Leader Federal Savings & Loan Ass'n*, 292 S.W.2d 458 (Tenn. Ct. App. 1953), and *Pikeville National Bank & Trust Co. v. Shirley*, 135 S.W.2d 426 (Ky. Ct. App. 1939). However, neither of those cases supports the Estate's argument that a gift causa mortis can never occur in the context of a donor's suicide.

¶19 In *Ray*, the Tennessee Court of Appeals was confronted with the following question when analyzing an alleged gift causa mortis: "Does death by contemplated suicide by a person who is presumed to be physically and mentally well, as in the instant case, arise from an apprehension due to a peculiar sickness, peril or danger?" *Ray*, 292 S.W.2d at 467. In answering that question, the court observed there was "nothing in the record to indicate that [the deceased] was not fully possessed of his mental faculties" at the time of his suicide. *Id.* On those facts, the court concluded that "[s]ickness, peril and danger, as used in definitions of [gifts] causa mortis … mean something other than a determination of an individual who is presumed to be well, physically and mentally, to take his life." *Id.*

¶20 As the above excerpts make clear, *Ray* addressed whether a gift causa mortis could occur in circumstances where the donor was "presumed to be physically and mentally well" at the time of his suicide. *Id.* *Ray* did not address whether a gift causa mortis can occur when the donor's suicide was caused by a present mental illness. Accordingly, *Ray* does not compel a conclusion that a gift causa mortis can never occur when the donor died by suicide.

¶21    The Estate's reliance on *Pikeville National Bank* is similarly misplaced.  In that case, the Kentucky Court of Appeals concluded certain gifts made before the donor's suicide did not qualify as gifts causa mortis "because vital and necessary elements [were] lacking, one of which is that such gifts must be made in expectation of imminent death from a disease or peril then impending." *Pikeville Nat'l Bank*, 135 S.W.2d at 429.  The court reasoned:

> While it is alleged in the petition and admitted by answer that decedent was afflicted with tuberculosis, he did not die of that disease, but came to his death by self-destruction which the record indicates he had contemplated and determined upon several days before he carried his determined purpose into effect.  Normal men are the arbiters of their own fate so far as suicide is concerned, since that is a matter within their own power of control.

*Id.*

¶22    The court in *Pikeville National Bank* considered a donor who had contemplated suicide for several days before making a decision to act.  In addition, the court presumed that the donor was a "normal" man whose decision to end his life was a rational choice within his own power and control.  As in *Ray*, the court did not consider a situation in which the donor died by suicide as a result of a present

9

mental illness. For that reason, neither *Ray* nor *Pikeville National Bank* convinces us that a gift causa mortis can never occur in the context of a donor's suicide.[4]

¶23 We find more persuasive two cases from other jurisdictions, in which the courts concluded a gift causa mortis had occurred where the donor's suicide was the result of a present mental illness. In the first of those cases, the evidence showed that the donor was in "a serious state of mental depression" following his divorce. *In re Van Wormer's Estate*, 238 N.W. 210, 210-11 (Mich. 1931). He told his mother that he was going to California to "go just as far away as he could from his troubles." *Id.* at 211. Before leaving, the donor purchased stock and directed that it be issued in his brother's name. *Id.* He then traveled to California, and while there he died by suicide. *Id.*

¶24 The Michigan Supreme Court concluded the donor's purchase of stock in his brother's name was a gift causa mortis. The court stated a gift causa mortis "cannot be sustained unless it appears from the record that at the time of the transaction the donor believed he was suffering from an affliction from which he

---

[4] In addition to its reliance on *Ray v. Leader Federal Savings & Loan Ass'n*, 292 S.W.2d 458 (Tenn. Ct. App. 1953), and *Pikeville National Bank & Trust Co. v. Shirley*, 135 S.W.2d 426 (Ky. Ct. App. 1939), the Estate asserts that courts in three other jurisdictions "have also failed to find a gift causa mortis where the donor committed suicide." In support of that assertion, the Estate cites—but does not discuss—a Maine case, a New Hampshire case, and two New York cases. However, neither the Maine case nor the New Hampshire case held that a gift causa mortis can never occur in a case where the donor died by suicide. *See Northwestern Mut. Life Ins. Co. v. Collamore*, 62 A. 652 (Me. 1905); *Blazo v. Cochrane*, 53 A. 1026 (N.H. 1902).

In the two New York cases, the courts concluded, as a matter of public policy, that a gift causa mortis cannot be enforced when the donor died by suicide. *See McGuire v. John Wanamaker, N.Y.*, 79 N.Y.S.2d 594, 595 (App. Div. 1948); *Bainbridge v. Hoes*, 149 N.Y.S. 20, 23 (App. Div. 1914). The Estate has not, however, raised any argument in this case that it would be against public policy to conclude Oaks made a gift causa mortis. The Estate's citations to the two New York cases are therefore unpersuasive.

10

might not recover and from which in fact he did not." *Id.* The court then concluded that requirement was satisfied in the case before it, explaining:

> The melancholia which evidently resulted in suicide had fastened itself upon [the] deceased before the date of the gift, and he obviously was convinced at that time that he could not continue on indefinitely in his depressed mental state. He attempted to travel away from his troubles. Weeks later he wrote, as quoted above, that he was then gradually getting a desire to want to live, and added in the same letter that he was then experiencing his first encouragement, and that he would probably return the middle of the summer, 'provided I meet with any measure of improvement.' The end a month later indicates he fought a losing fight. His gift made in contemplation should not be set aside.

*Id.* at 212.

¶25 The New Jersey Supreme Court reached a similar conclusion in *Scherer v. Hyland*, 380 A.2d 698 (N.J. 1977). There, the donor was "acutely depressed" during the weeks leading up to her death by suicide. *Id.* at 699. Before her death, she left a note stating that she bequeathed all of her possessions to her romantic partner. *Id.* at 699-700. Under those circumstances, the court concluded the donor had made a gift causa mortis. The court expressly rejected the appellant's contention that suicide is "not the sort of peril that will sustain a gift causa mortis." *Id.* at 702. The court explained:

> While it is true that a gift causa mortis is made by the donor with a view to impending death, death is no less impending because of a resolve to commit suicide. Nor does that fixed purpose constitute any lesser or less imminent peril than does a ravaging disease. Indeed, given the despair sufficient to end it all, the peril attendant upon contemplated suicide may reasonably be viewed as even more imminent than that accompanying many illnesses which prove ultimately to be fatal. And, the notion that one in a state of mental depression serious enough to lead to suicide is somehow "freer" to renounce the depression and thus the danger than one suffering from a physical illness, although it has a certain

11

augustinian appeal, has long since been replaced by more enlightened views of human psychology.

*Id.* (citations omitted).

¶26     Like the Michigan and New Jersey Supreme Courts, we conclude a gift causa mortis can occur in a case where the donor died by suicide as a result of a present mental illness. We therefore reject the Estate's assertion that a gift causa mortis can never be enforced in a case where the donor died by suicide.

¶27     In its reply brief, the Estate argues that even if a gift causa mortis can occur in a case where the donor's suicide was caused by a present mental illness, the evidence here did not establish that was the case. We disagree. In support of her summary judgment motion, Stouff submitted evidence that: (1) Oaks was a Vietnam War veteran and was exposed to "Agent Orange" during his military service; (2) Oaks had been diagnosed with posttraumatic stress disorder by a treatment provider and was prescribed an anti-depressant medication on at least one occasion; (3) during the months before his death, Oaks repeatedly complained to Stouff and others of pressure and pain in his head; (4) Oaks was convinced there was a physical problem in his brain that was "causing his various mental health ailments"; (5) Oaks "finally convinced the VA to schedule him an appointment with neurology to get his head scanned and evaluated," but he died before that appointment took place; and (6) Oaks' death certificate listed his cause of death as "SELF INFLICTED GUNSHOT WOUND TO HEAD … Due to or as a consequence of 'DEPRESSION.'"

¶28     A party establishes a prima facie case for summary judgment by setting forth evidentiary facts, "which[,] if they remain uncontradicted by the opposing party's affidavits[,] resolve all factual issues in the moving party's favor."

*Walter Kassuba, Inc. v. Bauch*, 38 Wis. 2d 648, 655, 158 N.W.2d 387 (1968). In this case, it is undisputed that Oaks made a gift to Stouff in anticipation of his own death by suicide. In addition, the facts set forth above, if uncontradicted, would establish: (1) that Oaks was suffering from a mental illness at the time of his death—specifically, depression; and (2) that Oaks' mental illness caused his suicide. Accordingly, Stouff established a prima facie case for summary judgment with respect to the second and third requirements for a gift causa mortis.

¶29    The Estate did not submit any affidavits or other evidentiary materials in response to Stouff's summary judgment motion, or in support of the Estate's own summary judgment motion. "[E]videntiary facts stated in the affidavits are to be taken as true if not contradicted by other opposing affidavits or proof." *Leszczynski v. Surges*, 30 Wis. 2d 534, 539, 141 N.W.2d 261 (1966). By failing to submit any evidentiary materials that would raise a genuine issue of material fact regarding the second and third requirements for a gift causa mortis, the Estate failed to defeat Stouff's prima facie case for summary judgment with respect to those requirements.[5]

¶30    We do not hold that a donor's death by suicide will always be sufficient to establish the second and third requirements for a gift causa mortis.

---

[5] The Estate argues the evidence Stouff submitted in support of her summary judgment motion did not establish that Oaks was suffering from a mental illness at the time of his suicide. The Estate contends there is "simply nothing in the trial court record pertaining to Oaks' mental state other than an allegation by Stouff that Oaks was diagnosed with PTSD sometime after Vietnam." That argument, however, ignores the other facts set forth above in ¶27, particularly the fact that Oaks' death certificate stated his suicide was "[d]ue to or as a consequence of 'DEPRESSION.'"

The Estate also asserts that the evidence summarized above gives rise to competing inferences "that may only be resolved by the circuit court." The Estate therefore argues there is a "genuine issue of material fact as to whether Oaks suffered from clinical depression." We disagree. Instead, we conclude the uncontroverted evidence on summary judgment gave rise to only one reasonable inference—i.e., that Oaks' suicide was the result of depression, a present mental illness.

Rather, the issue of whether the donor's suicide was caused by a present mental illness will ordinarily be a question of fact. Here, however, Stouff made a prima facie showing that Oaks was suffering from a mental illness at the time of his death and that the mental illness caused his suicide, and the Estate failed to rebut Stouff's prima facie showing. Under these circumstances, the circuit court properly determined, as a matter of law, that Stouff had established the second and third requirements for a gift causa mortis.

### B. Delivery of the gifted property

¶31    The Estate also argues Stouff failed to establish the fourth requirement for a gift causa mortis—i.e., delivery of the gifted property. The Estate contends that under Wisconsin law, "[v]alid delivery requires the decedent to physically give the intended gift, or indicia thereof, to the recipient." Citing **Will v. Vander Zanden**, 251 Wis. 90, 28 N.W.2d 360 (1947), the Estate argues a small item "should be handed over" to the recipient in order to effect a valid delivery. Citing **Hartwig v. East Wisconsin Trustee Co.**, 223 Wis. 218, 270 N.W. 71 (1936), the Estate argues that if the gift is "a safe deposit box or bank account, the keys or bank books, respectively[,] must be handed over." The Estate further contends the undisputed facts do not establish that any such physical delivery of the gifted property—or of indicia of ownership of the gifted property—occurred in this case.

¶32    The problem with the Estate's argument is that the gift in this case did not involve a single small item, or a single bank account or safe deposit box. Rather, in this case, Oaks gifted all of his "worldly belongings" to Stouff. As Stouff correctly observes, "[i]t would have been impossible for Mr. Oaks to physically hand Ms. Stouff everything [he owned]." Our supreme court has recognized that "[w]hat form the delivery of the property must take depends upon its nature and the

situation of the parties." ***Sorenson v. Friedmann***, 34 Wis. 2d 46, 55, 148 N.W.2d 745 (1967).[6] Here, given the all-encompassing nature of "all worldly belongings," the nature of the property did not permit actual, physical delivery of each item, or of indicia of ownership of each item, from Oaks to Stouff.

¶33 Moreover, ***Sorenson*** also directs us to consider the "situation of the parties" when assessing whether the delivery requirement has been satisfied. ***Id.*** In this case, Stouff and Oaks had been in a romantic relationship for over twenty-three years prior to Oaks' death and had lived together for approximately ten years. We have previously held that "a relaxed rule as to delivery and dominion applies when determining whether persons living in the same household have made and received a gift." ***Potts v. Garionis***, 127 Wis. 2d 47, 54, 377 N.W.2d 204 (Ct. App. 1985).

¶34 In ***Potts***, the decedent, Charles, and his wife, Constance, lived together at Charles' motel for many years. ***Id.*** at 49. During that time, Constance saved silver coins due to a fear that paper money would become worthless. ***Id.*** Constance worked at the motel, and although Charles did not pay her wages, he "permitted her to take coins from the motel cash drawer and coin operated machines," and he sometimes gave her money to buy rolls of coins from the bank. ***Id.*** at 50. Constance hid the silver coins in a back room at the motel. ***Id.*** When the couple later moved into a house, Charles built a secret compartment for the coins. ***Id.*** Over the years, he repeatedly referred to the coins as belonging to Constance. ***Id.***

---

[6] ***Sorenson v. Friedmann***, 34 Wis. 2d 46, 55, 148 N.W.2d 745 (1967), addressed the delivery requirement for a gift inter vivos. However, the delivery requirement for a gift causa mortis "is the same as it is for a gift inter vivos where the subject matter of the gift is the same." ***Meegan v. Netzer***, 2012 WI App 20, ¶12, 339 Wis. 2d 460, 810 N.W.2d 358. Accordingly, when analyzing whether the delivery requirement has been satisfied for a gift causa mortis, "we may look to cases that concern gifts inter vivos." ***Id.***

¶35     The circuit court concluded Charles had given the coins to Constance during his lifetime, *id.*, and we affirmed that ruling on appeal.  We concluded the court reasonably inferred that Charles "delivered the coins to [Constance] by giving her money to buy rolls of coins, permitting her to take coins from the cash drawer, and referring to coins already rolled and stored in the back room as 'Connie's' or 'Momma's silver.'"  *Id.* at 54-55.  We reasoned,

> Using a relaxed standard as to the transfer of dominion between members of the same household, Connie's accumulation of the coins, with Charles' acquiescence and his statements as to the owner of the coins[,] is sufficient evidence to permit a reasonable inference that Charles terminated dominion over the coins, and Connie asserted dominion over them.

*Id.* at 55.

¶36     Our supreme court also addressed the delivery of a gift between two members of the same household in *Horn v. Horn*, 152 Wis. 482, 140 N.W. 58 (1913).  In that case, a father gifted horses to two of his sons—Charles and Louis.  *Id.* at 484.  Charles married and left the family farm, but Louis remained there until his father's death.  *Id.* at 486-87.  The horses gifted to Louis therefore also remained on the farm until his father's death.  On these facts, the supreme court concluded the horses had been delivered to Louis, even though they never left the family farm.  The court reasoned:

> Louis alone remained with his father after Charles removed from the parental home, and he continued on the farm until his father's death.  Under these circumstances a delivery of the horses to Louis required no act from the father aside from his declaration that he then gave them to Louis and surrendered dominion over them, and aside from his regarding them thereafter as the property of Louis.

*Id.* at 487.

16

¶37　　*Potts* and *Horn* make it clear that when one member of a household gifts property to another member of the same household, and the property is located at their shared residence, physical delivery of the property from one to the other is not required.  Rather, what is necessary is that the donor declare his or her intention to make a gift and thereafter treat the property as belonging to the donee.

¶38　　That is precisely what occurred in this case.  Just before ending his life, Oaks left a note on a table in the home he shared with Stouff directing that all of his "worldly belongings" should go to Stouff upon his death.  Stouff was already in physical possession of the residence and all of the property inside it, and she had access to indicia of ownership for the rest of Oaks' belongings—i.e., keys to his vehicles, checkbooks, and bank account information.  After leaving the note, Oaks fatally shot himself in the head while Stouff was asleep in the upper floor of their residence.  Having been awoken by the gunshot, Stouff went downstairs and found the note on the table.  We agree with Stouff that under these circumstances, "when Mr. Oaks left the note for Ms. Stouff on the table and when Ms. Stouff found the note, he completed delivery for the purpose of the gift causa mortis analysis." (Emphasis omitted.)

¶39　　Our supreme court's decision in *Sorenson* further supports this conclusion.  In that case, the court affirmed a circuit court's finding that Edith Detjen had made a completed gift to Ann Friedmann of money in a bank account through the "symbolical delivery" to Friedmann of the account passbook.  *Sorenson*, 34 Wis. 2d at 55-56.  The evidence in *Sorenson* showed that Detjen, who had been hemorrhaging from the mouth, was waiting at home for an ambulance to take her to the hospital.  *Id.* at 51.  Two of her friends testified that while waiting for the ambulance, Detjen called Friedmann into the room and told Friedmann that "she

was making a gift [to her] of the West Side Bank account and that she, Ann Friedmann, should withdraw the money." *Id.*

¶40     The friends' testimony differed, however, regarding Detjen's delivery of the account passbook to Friedmann.  One friend testified Detjen gave the passbook to Friedmann immediately after informing Friedmann of the gift. *Id.*  The other friend testified that Detjen stated the passbook was in a box inside a dresser drawer, but the same friend later testified that she saw a book of the same color as Detjen's passbook in Friedmann's hands. *Id.* at 51-52.  Friedmann testified Detjen had given her the passbook when the account was opened and it had been in Friedmann's possession ever since. *Id.* at 52.  Our supreme court concluded these differences in the witnesses' testimony were "immaterial," explaining that "[p]roperty validly in the possession of the donee need not be returned to the donor so that it can be handed back to the donee." *Id.* at 55-56.  In other words, the fact that Friedmann was—according to her own testimony—already in possession of the account passbook did not prevent Detjen from completing a valid delivery of the gift.

¶41     Similarly, in this case, the fact that Stouff was already in possession of Oaks' property by virtue of their cohabitation did not prevent Oaks from making a valid delivery of his property to Stouff for purposes of the fourth requirement for a gift causa mortis.  Instead, under the "relaxed rule" that applies when assessing the delivery of a gift between members of the same household, *see Potts*, 127 Wis. 2d at 54, we conclude Oaks delivered his property to Stouff by leaving a note informing her of the gift on a table in their shared residence, which he could be reasonably certain Stouff would find when she came downstairs.

¶42    Accordingly, and for the reasons explained above, we reject the Estate's argument that Stouff failed to establish the second, third, and fourth requirements for a gift causa mortis. Stouff made a prima facie showing with respect to each of those elements, and the Estate did not submit any evidence that would establish a disputed issue of material fact. As such, the circuit court properly granted Stouff summary judgment on her claim for Oaks' entire estate under the doctrine of gift causa mortis.

## II. Reimbursement for claimed expenses

¶43    Finally, the Estate argues the circuit court erred by granting Stouff summary judgment on her claim for reimbursement of certain expenses she claimed to have paid on behalf of the Estate. Specifically, the Estate contends it had a statutory right to a trial on Stouff's claim for reimbursement under WIS. STAT. § 859.33(2), which provides:

> If any claim, offset or counterclaim is contested, the court may require the issues to be made definite, fix a date for pretrial conference and direct the manner in which pleadings, if any, shall be exchanged. *The court shall set a time for trial upon its own motion or upon motion of any party.*

(Emphasis added.)

¶44    We conclude the Estate forfeited this argument by failing to raise it in the circuit court. *See **Tatera v. FMC Corp.***, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."). The Estate never requested a trial on Stouff's claim for reimbursement during the circuit court proceedings, nor did the Estate argue the court was required to hold a trial under WIS. STAT. § 859.33(2).

¶45 Instead, the record shows that during a scheduling conference after the Estate had partially denied Stouff's claim for reimbursement, Stouff asked the circuit court to set a briefing schedule for summary judgment motions. The Estate did not object to that request or argue that the court could not resolve Stouff's reimbursement claim on summary judgment. In fact, the Estate conceded, "At some point the court's going to have to make a ruling as to the law based on whatever facts are out there."

¶46 The circuit court subsequently entered a scheduling order that included time limits for the parties to file dispositive motions. Again, the Estate did not object. Shortly thereafter, Stouff moved for summary judgment on all of her claims—including her claim for reimbursement. The Estate never argued in response to Stouff's summary judgment motion that summary judgment was inappropriate because the Estate had a statutory right to a trial under WIS. STAT. § 859.33(2).

¶47 In fact, rather than objecting to Stouff's summary judgment motion on the grounds that WIS. STAT. § 859.33(2) required the circuit court to hold a trial on Stouff's reimbursement claim, the Estate filed its own summary judgment motion regarding that claim. In support of that motion, the Estate expressly argued that it was entitled to summary judgment because there was "no issue of material fact as to whether the Estate must reimburse Stouff for her decision to hold a funeral service and celebration in North Carolina and to pay some of Oaks' debts after his death." The court subsequently held a hearing on the parties' cross-motions for summary judgment. During that hearing, the Estate never argued that it was entitled to a trial under § 859.33(2) or that the statute prevented the court from granting Stouff summary judgment.

¶48    On these facts, it is clear the Estate forfeited its argument that WIS. STAT. § 859.33(2) required the circuit court to hold a trial on Stouff's reimbursement claim. "We will not … blindside trial courts with reversals based on theories which did not originate in their forum." *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995). The Estate argues it preserved its argument regarding § 859.33(2) by arguing in the circuit court "that the personal representative has the discretion to deny claims made against an estate by a third party." However, arguing that a personal representative has discretion to deny claims is not the same as arguing that § 859.33(2) required the court to hold a trial on Stouff's reimbursement claim. We agree with Stouff that the Estate "fails on appeal to develop an argument connecting those ideas to each other in any cognizant way."

¶49    Regardless of the Estate's forfeiture, we also reject the Estate's argument that the circuit court erred by failing to hold a trial on Stouff's reimbursement claim for two additional reasons. First, the Estate essentially reads WIS. STAT. § 859.33(2) as stating that a court "shall hold a trial" on contested claims in a probate case. The statute, however, contains no language to that effect. Instead, it merely states that a court "shall set a time for trial." *Id.* Moreover, the statute provides that the court shall set a time for trial "upon its own motion or upon motion of any party." *Id.* That wording indicates that a motion is necessary before a trial must be scheduled. If the court does not seek to hold a trial on its own initiative, and if no party moves the court to set a trial date, there is no requirement in the statute that the court hold a trial rather than resolving a contested claim on summary judgment.

¶50    Second, the Estate's reading of WIS. STAT. § 859.33(2) would lead to absurd results. It is axiomatic that the purpose of summary judgment is "to avoid

trials when there is nothing to try." ***Tews v. NHI, LLC***, 2010 WI 137, ¶42, 330 Wis. 2d 389, 793 N.W.2d 860. Here, the facts regarding Stouff's reimbursement claim were undisputed, as the Estate conceded in its motion for summary judgment on that claim. Based on those undisputed facts, the circuit court concluded the Estate was required to reimburse Stouff for the funeral expenses she had paid because they qualified as reasonable funeral expenses under WIS. STAT. § 859.25(1)(b). The court further concluded the Estate was required to reimburse Stouff for the payments she had made toward Oaks' insurance premiums and credit card balance because those payments qualified as costs and expenses of administration of the Estate under § 859.25(1)(a). Requiring a trial under these circumstances—where the facts were undisputed and only legal issues remained— would be an absurd result.

¶51 We therefore reject the Estate's argument that the circuit court erred by granting Stouff summary judgment on her claim for reimbursement. However, as noted above, it appears the court made a mathematical error when calculating the amount of Stouff's claimed expenses. The sum of the expenses listed in the court's written decision, plus the $2267 in cremation expenses that the Estate had already agreed to pay, is $4760.51. Nevertheless, the court awarded Stouff only $4287.51. It appears that when adding the amounts of Stouff's claimed expenses, the court neglected to add in the $100 payment Stouff made toward Oaks' credit card balance and the $373 she paid toward Oaks' insurance premiums. The court clearly indicated, however, that Stouff was entitled to recover those amounts. We therefore modify the court's order to award Stouff $4760.51 on her reimbursement claim and, as modified, affirm.

*By the Court.*—Order modified and, as modified, affirmed.

22