COURT OF APPEALS
DECISION
DATED AND FILED

September 28, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP429**

STATE OF WISCONSIN

Cir. Ct. No. 2018CV2024

IN COURT OF APPEALS
DISTRICT IV

FRANK CAIN,

PLAINTIFF-APPELLANT,

V.

CUNA MUTUAL HOLDING COMPANY,
TRUSTAGE INSURANCE AGENCY, LLC,
AND CMFG LIFE INSURANCE COMPANY,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed.*

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Frank Cain appeals a circuit court order granting summary judgment to CUNA Mutual Holding Company, TruStage Insurance Agency, LLC, and CMFG Life Insurance Company (collectively, "CUNA") and dismissing Cain's claims for invasion of privacy and unjust enrichment.  The court concluded that Cain's claims are barred by laches.  We affirm.

## BACKGROUND

¶2      The following facts are not disputed unless otherwise indicated. CUNA sells insurance products to credit union members throughout the United States.  Cain started working with CUNA as an insurance agent in 2003.  Cain was promoted in 2006 and again in 2008 to a middle-management position.  The 2008 promotion resulted in Cain receiving a new title, Manager of Business Operations, in addition to a raise and new job responsibilities, including training new insurance agents.  Cain remained in middle-management positions until he left CUNA in 2018.

¶3      CUNA markets its insurance products by sending direct mail kits to potential customers in all fifty states.  The mail kit includes a sales letter and an application to purchase insurance.  The applicable insurance regulations require that the sales letter be signed by an insurance agent licensed in the state where the direct mail kit is sent.  In order to comply with these regulations, CUNA uses on its sales letters the name of a CUNA agent licensed in all fifty states so that it can use a single, standardized cover letter.

¶4      For many years, CUNA used CUNA agent Keith Tlapa's name and signature on its life insurance and accidental death and dismemberment (AD&D) insurance sales letters.  Tlapa was an assistant vice president and the top employee in the Sales and Marketing Interaction Center, the division where Cain worked.

2

CUNA did not pay Tlapa any additional compensation beyond his standard salary for the use of his name and signature on sales letters. CUNA had used other employees' names on sales letters throughout the years and did not pay them any additional compensation for the use of their names.

¶5 In 2008, Tlapa left CUNA and a new signature was needed for life and AD&D insurance mail kits. At that time, employees from CUNA's marketing department approached Cain and asked him to provide his signature for use in the mail kits. Cain provided his signature by signing his name three times on a blank piece of paper. At the time of his 2021 deposition in this matter, Cain did not remember who these employees were, how many of them there were, whether he spoke to them in person or electronically, where he was when he signed his name, or whether he ever spoke with these employees again. Cain acknowledged during his deposition that his memory would have been better in 2009.

¶6 Cain testified that he did not give the employees who approached him consent to use his name on the sales letters. He did not want his name on CUNA's sales letters because he had seen the complaints that Tlapa received from the letters' recipients when Tlapa's name was used. He did not tell the marketing employees who approached him that he did not want his name on the letters because he was afraid there would be negative consequences for his career at CUNA if he did so.

¶7 From December 2008 through the end of 2017, CUNA used Cain's name and signature on its sales letters for all of its life insurance and most of its

3

AD&D insurance.[1]  On January 1, 2018, CUNA began using another CUNA agent's name on sales letters, but Cain's name continued to be used on some sales letters for the early part of 2018.  During the pertinent time period, CUNA sent more than a billion sales letters using Cain's name.  Beginning in 2011, CUNA also used Cain's name on "conversion letters," which are solicitations sent to current policyholders soliciting them to convert from a term life insurance policy to a permanent (whole life) insurance policy.  According to the deposition testimony of CUNA corporate representative Jeffrey Tambling, Cain's name "might have" continued to be used on the conversion letters through late 2018 or early 2019.

¶8    Cain knew by late 2008 or early 2009 that CUNA had started using his name on its sales letters and was aware that CUNA was using his name throughout the period in which it was being used.  Cain testified that he never asked CUNA for additional compensation for using his signature because:  (1) he believed use of his name would be temporary; and (2) he "didn't want compensation for something that [he] couldn't stand," which was "[his] name being on [the letters] in the first place" and he believed that if he were compensated, this might prolong the use of his name on the sales letters.  He also testified that he did not believe he would be provided compensation for the use of his name had he asked because CUNA "would have moved to somebody else

---

[1] During a period of time between September 2010 and January 2016, Cain's name did not appear on all AD&D insurance sales letters.  For some or all of the 2008-2017 time period, CUNA also used Cain's name on letters that were sent to customers in response to their complaints.

that's willing to throw their name on there" and would have "then got rid of [him]."[2]

¶9    Cain testified that he believed that the use of his name on the sales letters would be temporary and that CUNA would eventually use the name of a director or someone in a higher role than his. He had multiple supervisors over the course of his employment at CUNA and when a new supervisor came in, he would "have a conversation about them having their name put on the mailings" instead of his.

¶10    Between 2008 and 2018, Cain also complained to multiple CUNA employees that he was unhappy with CUNA's use of his name on the sales letters. For example, in 2011, Cain told his manager Jeff Khoury that he was getting a "ton of … calls" complaining about the mailings and that he "wanted to be off the mailings completely." According to Cain's deposition testimony, Khoury told him, "You have a good reputation with the organization. I would keep quiet."[3]

¶11    In 2008, when CUNA first started using Cain's name on the sales letters, it had at least thirteen other agents who were licensed in all fifty states. By

_____

[2] In 2016, CUNA approached Cain about having his photograph taken for a marketing test CUNA conducted that included Cain's photograph next to his name and signature on sales letters. Cain did not inform CUNA that he did not want his photograph used for the sales letters nor did he ask for additional compensation for such use. On appeal, Cain does not raise any issues with respect to CUNA's use of his image and we therefore do not discuss CUNA's use of Cain's image.

[3] In his appellant's brief, Cain also references a conversation he had with CUNA employees in which they discussed the possibility of Cain's name being used on documents in Florida, and someone commented that if "anything happens," Cain would be the one who would "wear the orange jumpsuit." According to Cain, he voiced his displeasure with the use of his name and suggested that CUNA use someone else's name. However, because the parts of the record Cain cites do not establish what these Florida documents were or whether Cain's name was ever used on them, we do not consider this incident.

2018, when CUNA stopped using Cain's name, it had at least 164 other agents who were licensed in all fifty states. Cain acknowledged in his deposition that it was not difficult for CUNA to get an agent licensed in all fifty states: CUNA "would just go ahead and file the application and be done with it." Cain also testified that, had he brought a lawsuit when he first learned that his name was being used on the sales letters, "[t]hey had plenty of other individuals that were licensed in all 50 states that they could use on there."

¶12 In 2016, the Minnesota Department of Commerce brought an action against Cain's insurance producer license based on allegations that Cain violated Minnesota law by sending "an advertisement which has the tendency to be misleading, specifically using the State of Minnesota logo." Cain agreed to an informal disposition of the matter and entered into a consent order with the Minnesota Department of Commerce. This resulted in a $2,500 penalty, which CUNA paid, and an agreement from Cain to cease and desist from further violations.

¶13 The Minnesota violation is on Cain's record as an insurance agent, and he was required to report it to all other states. Cain spoke to an attorney in CUNA's legal department and expressed concern about the impact the Minnesota action would have on his career. Cain testified that the attorney told him that it was "no different than if [he] got … a traffic ticket."[4] Cain also told Nate O'Neill, Cain's friend and colleague, that he was seeking an attorney to "potentially mov[e]

---

[4] In his sworn responses to discovery, Cain also represented that he told legal counsel during the 2016 meeting that "it would be nice to be removed from the marketing" and that counsel responded that "CUNA could figure out something from a legal standpoint to provide [Cain] with more protection."

forward with legal action" "[w]ith respect to the Minnesota situation." Cain told O'Neill that he wanted to "look at ways to be able to … make this fair in terms of me having this on my permanent record as a licensed insurance agent."

¶14    Other than his conversation with O'Neill, Cain did not tell anyone at CUNA that he intended to bring a claim against CUNA related to the use of his name on the sales letters. Cain testified that he did not do so because he wanted to keep his job. Cain further testified that he never put anything in writing regarding his desire to have his name removed from the sales letters because he thought it would lead to CUNA firing him or stunting his growth in the organization.

¶15    In March 2018, Cain left CUNA for a job elsewhere. Cain filed this action four months later. Cain's operative complaint brought claims for violation of the right to privacy under WIS. STAT. § 995.50(2)(am)2. (2021-22) and unjust enrichment.[5]  As to the privacy claim under § 995.50, Cain argued that CUNA's use of his name on CUNA's direct mail solicitations, without having obtained Cain's written consent, violated § 995.50(2)(am)2.  *See* § 995.50(2)(am)2. (providing that it is an invasion of privacy to "use, for advertising purposes or for purposes of trade, … the name, portrait or picture of any living person, without having first obtained the written consent of the person."). As to the unjust

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. When Cain commenced this action in 2018, the right of privacy provision giving rise to this claim was numbered WIS. STAT. § 995.50(2)(b) (2017-18). In 2020, the section was renumbered and is now § 995.50(2)(am)2. *See* 2019 Wis. Act 72 § 1. This opinion uses the current numbering.

Separately, we note that Cain's original complaint also included a claim for defamation but that claim was dismissed pursuant to CUNA's motion to dismiss. Cain subsequently filed an amended complaint containing only the right to privacy and unjust enrichment claims, which are the only two claims at issue on appeal. Finally, Cain's complaint also referred to use of his image, which, as stated, we do not discuss here.

enrichment claim, Cain alleged that CUNA was unjustly enriched by using Cain's name in its direct mail solicitations without providing Cain with compensation for such use.

¶16    CUNA moved for judgment on the pleadings, arguing that Cain's claims are barred by laches, waiver, and estoppel, and also barred in part by the applicable statute of limitations.  The circuit court denied CUNA's motion for judgment on the pleadings as to laches, estoppel, and waiver but granted CUNA's motion with respect to the statute of limitations, limiting Cain's privacy claim to acts within a three-year limitations period and his unjust enrichment claim to acts within a six-year limitations period.

¶17    According to a damages expert Cain retained, damages for the six-year period were $7,865,000 and damages for the three-year period were $4,329,000.

¶18    The parties filed cross-motions for summary judgment, with CUNA arguing, among other things, that the doctrine of laches bars Cain's claims.  The circuit court granted CUNA's motion for summary judgment, concluding that Cain's claims are barred by laches.  Cain appeals.  Additional facts are provided as necessary in the discussion that follows.

## DISCUSSION

*I. Standard of Review and General Principles of Law Governing Laches*

¶19    We review a circuit court's ruling on summary judgment de novo, using the same methodology as the circuit court.  ***Estate of Oaks v. Stouff***, 2020 WI App 29, ¶11, 392 Wis. 2d 352, 944 N.W.2d 611.  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶20 Here, CUNA moved for summary judgment based on the equitable doctrine of laches. "Laches is an equitable doctrine whereby a party that delays making a claim may lose its right to assert that claim." *Zizzo v. Lakeside Steel & Mfg. Co.*, 2008 WI App 69, ¶7, 312 Wis. 2d 463, 752 N.W.2d 889. Laches is founded on the notion that "equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party." *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587. Under Wisconsin law, the application of laches requires proof of three elements: "(1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge that the first party would raise that claim; and (3) the second party is prejudiced by the delay." *Wisconsin Small Bus. United, Inc. v. Brennan*, 2020 WI 69, ¶12, 393 Wis. 2d 308, 946 N.W.2d 101. The burden of proving each element is on the party seeking application of laches. *Id.* Whether the elements of laches are met presents a question of law that we review de novo. *Zizzo*, 312 Wis. 2d 463, ¶6.

¶21 In addition, "[e]ven if all three elements are satisfied, application of laches is left to the sound discretion of the court asked to apply this equitable bar." *Brennan*, 393 Wis. 2d 308, ¶12. We review this second step for an erroneous exercise of discretion. *Wren*, 389 Wis. 2d 516, ¶16. A court may properly decide laches on a motion for summary judgment. *Schafer v. Wegner*, 78 Wis. 2d 127, 136, 254 N.W.2d 193 (1977).

9

## II. *Laches vs. Statute of Limitations*

¶22 As previously noted, the circuit court limited Cain's right of privacy claim to acts within a three-year limitations period and his unjust enrichment claim to acts within a six-year limitations period. This conclusion was based on the premise that each letter bearing Cain's name constitutes a discrete act, such that the statutory limitations period to bring a claim commenced when each letter was sent. At various points throughout his briefing, Cain attempts to use the court's reasoning on this topic as a defense against laches, arguing that the court "erred as a matter of law" by applying laches to bar Cain's claims for ongoing violations that fall within the statute of limitations. Cain's argument is contrary to precedent recognizing that laches may be applied to claims occurring within a statute of limitations period.

¶23 For example, our supreme court recognized in *Wren* that laches is an "equitable principle" that operates "independently of any statute of limitations." *Wren*, 389 Wis. 2d 516, ¶13 n.8. The court reiterated this principle as recently as 2020, stating that laches "can and regularly does apply even before a statute of limitation has expired." *Brennan*, 393 Wis. 2d 308, ¶16; *see also Zizzo*, 312 Wis. 2d 463, ¶7 ("Laches is distinct from a statute of limitations and may be found where the statute of limitations has not yet run."). Additionally, our supreme court has upheld summary judgment on the basis of laches despite a party's compliance with the statute of limitations. *See Schafer*, 78 Wis. 2d at 132-33 (applying laches to conclude that a party's waiting thirteen years to attempt to obtain household furniture awarded in a divorce decree was unreasonable, despite the fact that a twenty-year statute of limitations applied). Thus, our case law is clear that laches may be invoked to preclude a claim even when the claim was filed within a statute of limitations period.

¶24 Notably, Cain cites no Wisconsin law to support his position that—at least, as here, where the violations are ongoing—laches may not be applied to claims that are within the statute of limitations. Instead, he relies on a United States Supreme Court case, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014).[6] The question in *Petrella* was "whether the equitable defense of laches … may bar relief on a copyright infringement claim brought within [the federal copyright statute's] three-year limitations period." *Id.* at 667. The court held that "in the face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief" for claims brought within the three-year window. *Id.* at 667, 679.

¶25 Although the *Petrella* Court noted that each individual act of copyright infringement starts a new limitations period, *id.* at 671, that fact was not central to the Court's holding. Rather, the Court's holding was premised on the rationale that "courts are not at liberty to jettison Congress' judgment on the timeliness of suit." *Id.* The Court observed, "'When Congress fails to enact a statute of limitations, a [federal] court that borrows a state statute of limitations but permits it to be abridged by the doctrine of laches is not invading congressional prerogatives. It is merely filling a legislative hole.'" *Id.* at 669-70 (alteration in original; quoted source omitted). Under the federal Copyright Act, however, "Congress addressed the matter and filled the hole." *Id.* The Court noted that the federal limitations prescription governing copyright suits serves two purposes:

---

[6] In a footnote, Cain also cites *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 580 U.S. 328 (2017), noting that the Court in that case applied the analysis in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), to the federal Patent Act. We do not separately discuss *SCA Hygiene*, given Cain's abbreviated reference to that case and because *SCA Hygiene* relies on the same rationale as *Petrella*.

first, "to render uniform and certain the time within which copyright claims could be pursued"; and, second, "to prevent the forum shopping invited by disparate state limitations periods, which ranged from one to eight years." *Id.* at 670.

¶26 Significantly, the *Petrella* Court also noted that it had "never applied laches to bar in their entirety claims for discrete wrongs occurring within a federally prescribed limitations period" and that "inviting individual judges to set a time limit other than the one Congress prescribed" would "tug against the uniformity Congress sought to achieve when it enacted" the federal limitations provision at issue. *Id.* at 680-81.

¶27 In contrast, Wisconsin precedent specifically allows for the application of laches within the statute of limitations set by the Wisconsin legislature. Thus, adopting the *Petrella* Court's approach as Cain urges would contradict Wisconsin's well-established jurisprudence regarding laches.

¶28 Cain argues that the instant case is materially distinguishable from precedent such as *Brennan* and *Wren* because, similar to *Petrella*, this case involves claims that "continue[d] to accrue, up to and even after the complaint was filed." Cain's arguments are unpersuasive. Cain points to nothing in our jurisprudence that would suggest that laches cannot apply to an ongoing course of conduct. Indeed, the point made in cases such as *Brennan* and *Wren* is that laches is designed to operate "independently of any statute of limitations" analysis. *See Wren*, 389 Wis. 2d 516, ¶13 n.8.

¶29 In short, Cain fails to offer any case law or developed argument as to why—given Wisconsin's jurisprudence specifically allowing for the application of laches within a statutory limitations period—laches is precluded here. Thus, we reject Cain's argument.

12

*III. The Three Elements of Laches*

¶30 Cain argues that there are disputed issues of material fact as to the three elements of laches and that CUNA failed to meet its burden of establishing these elements as a matter of law. For the reasons we now explain, we disagree.

A. <u>Unreasonable Delay</u>

¶31 "The reasonableness of the delay, and whether prejudice resulted from the delay, are questions of law based upon factual findings." ***Dickau v. Dickau***, 2012 WI App 111, ¶9, 344 Wis. 2d 308, 824 N.W.2d 142. The reasonableness inquiry is case-specific and based on a totality of the circumstances. ***Wren***, 389 Wis. 2d 516, ¶18. "[U]nreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence." ***Id.***, ¶20. In order to decide whether the delay is unreasonable, the court determines when the party knew or should have known that he or she had a potential claim: this starts the "delay clock" running. ***Id.***, ¶21.

¶32 Here, it is undisputed that Cain knew by late 2008 or early 2009 that CUNA had started to use his name on its sales letters. Based on the undisputed facts, we conclude that Cain's waiting until 2018 to file suit was unreasonable. *See id.* ("[A] habeas petition coming ten years after [petitioner's] conviction and six years after he knew his attorney didn't file the appeal he was allegedly promised is a delay without good reason."); ***State ex rel. Coleman v. McCaughtry***, 2006 WI 49, ¶33, 290 Wis. 2d 352, 714 N.W.2d 900, *opinion clarified on denial of reconsideration*, 2006 WI 121, 297 Wis. 2d 587, 723 N.W.2d 424 ("Coleman knew of his claim for more than 16 years but he did nothing, year after year. Accordingly, we agree with the court of appeals that the State has proved Coleman's delay as unreasonable as a matter of law.").

¶33    In addition to the length of time it took Cain to bring his claims, the delay is also rendered unreasonable by the undisputed fact that CUNA could have used another employee's name on the letters had Cain informed CUNA of his intention to bring a legal action for CUNA's use of his name on them. As stated, in 2008 when CUNA first started using Cain's name, it had at least thirteen other agents who were licensed in all fifty states. And by 2018, when CUNA stopped using Cain's name, it had at least 164 other agents who were licensed in all fifty states. As also noted, Cain himself testified as to the ease with which CUNA could get someone licensed in fifty states; that, had he requested additional compensation, CUNA would simply get someone else to "throw their name" on the letters; and that CUNA "had plenty of other individuals that were licensed in all 50 states that [CUNA] could use on" the letters.

¶34    In arguing that CUNA did not meet its burden of establishing that the delay was unreasonable, Cain emphasizes evidence showing that he believed the use of his signature was temporary, particularly given that he was not a director-level employee and his complaints about the use of his name to supervisors and other employees. We conclude that Cain's subjective belief on this point does not justify the approximately ten-year delay in bringing his claims, or even the three- or six-year delay during the respective limitations periods applicable to his claims. As stated by the circuit court, "[E]ven if this is true, after one or two years of seeing his name continuing to be used, it was (or should have been) apparent that the use of his name was not short lived. Cain cannot now justify his delay because he believed [CUNA] would eventually stop using his name."

¶35    Cain also emphasizes evidence showing that he feared employment repercussions if he filed suit or insisted that his name be taken off the letters. We

agree with the circuit court that, although Cain's subjective fear of repercussions "might explain the *reasoning* for his delay in filing suit, it does not make the delay *reasonable*." Significantly, Cain cites no authority for the proposition that his desire to keep, or advance in, his position at CUNA is a sufficient justification for the lengthy delay in bringing a claim. Indeed, as CUNA notes, laches is applicable even in the context of hostile work environment claims. *See, e.g.*, *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002) (stating within the context of a hostile work environment case that "an employer may raise a laches defense, which bars a plaintiff from maintaining a suit if [the plaintiff] unreasonably delays in filing a suit and as a result harms the defendant.").[7]

¶36 Accordingly, we conclude that there are no genuine issues of material fact regarding the reasonableness of Cain's delay and that the delay is unreasonable as a matter of law.

B. Lack of Knowledge

¶37 The second element of laches requires CUNA to prove that it lacked knowledge that Cain would bring these claims. *See Trump v. Biden*, 2020 WI 91, ¶23, 394 Wis. 2d 629, 951 N.W.2d 568. The circuit court concluded that CUNA satisfied the second element of laches because it "had no advance[] knowledge that Cain would assert the particular claim that [CUNA] invaded his privacy by

---

[7] Cain also takes issue with various statements by the circuit court, which he says reflect the weighing of evidence and credibility determinations that are improper in the context of summary judgment proceedings. He further argues that the court shifted the burden to Cain of disproving the elements of laches. Although we do not agree with Cain's characterization of the court's statements, more importantly, we reiterate that our review of the elements of laches on summary judgment is de novo. Thus, regardless of the court's statements or approach, we may affirm an order granting summary judgment if the undisputed material facts show that CUNA is entitled to judgment as a matter of law. That is the case here.

failing to obtain written consent or the claim that [CUNA] was unjustly enriched through the use of his name." We agree.

¶38 Cain argues that there are genuine issues of material fact regarding whether CUNA had knowledge that Cain would assert his claims. He relies on evidence showing that he repeatedly told CUNA supervisors and colleagues that he objected to the use of his name and wanted it to be taken off the letters. The circuit court noted that CUNA "does not dispute that Cain told other employees that he did not like his name being on the letters, and that he was upset by the number of complaints he received because of [CUNA's] use of his name." However, the court concluded, and we agree, that "such complaints, even when made to his superiors, [do not] lead to the conclusion that [CUNA] had knowledge of Cain's present claims."

¶39 The circuit court also examined the conversations Cain had with CUNA's legal counsel following the 2016 Minnesota administrative action against him. As noted, Cain expressed concern to counsel about the impact the Minnesota action would have on his career, and he also informed his friend and colleague, O'Neill, that he was seeking an attorney "to discuss potentially moving forward with legal action" "[w]ith respect to the Minnesota situation." We agree with the circuit court that these conversations relate specifically to the Minnesota action and would not have apprised CUNA that Cain would be seeking legal action for invasion of privacy and unjust enrichment.

¶40 Cain argues that the second element of laches does not require that CUNA know with such specificity the claims that Cain would pursue and that, in any event, Cain's complaints about the use of his name "reasonably put CUNA on notice that Cain was concerned about his right to privacy, or concerned that

CUNA was being unjustly enriched at Cain's expense." As to the latter argument, we note that having notice that someone is "concerned" is not the same as having knowledge that a party will be sued over those concerns.

¶41 As to Cain's argument regarding the specificity of knowledge required, our recent precedent appears to suggest that the knowledge element contemplates knowledge of particular legal claims. *See Trump*, 394 Wis. 2d 629, ¶23 ("The second element of laches requires that the respondents lacked knowledge that the [defendant] would bring *these claims*." (emphasis added)); *Brennan*, 393 Wis. 2d 308, ¶18 (second element of laches requires that "a second party lacks knowledge that the first party would raise *that claim*" (emphasis added)); *id.* ("We also determine the respondents lacked knowledge of [plaintiff's] forthcoming claim …. Based on the undisputed record before us, the respondents here had no advance knowledge or warning of this *particular claim*. That is sufficient to satisfy this element of a laches defense." (emphasis added)).

¶42 However, even if this precedent is construed to require something less than knowledge of the precise legal claim asserted, Cain does not prevail on this issue. Cain relies on the knowledge standard as articulated in *Sawyer v. Midelfort*, 227 Wis. 2d 124, ¶74, 595 N.W.2d 423 (1999), *i.e.*, that a defendant must lack "knowledge that the plaintiff would assert the right on which the suit is based." Applying that language here, we conclude that Cain's generalized complaints to CUNA about the use of his name resulting in customer complaints and the Minnesota action and his statements that he did not want his name on the letters are not enough to establish that CUNA had "knowledge" that Cain "would" assert the legal rights on which his suit is based. *Id.*

¶43 Thus, as in ***Brennan***, "[b]ased on the undisputed record before us, [CUNA] had no advance knowledge or warning of [either of] th[ese] particular claim[s]. That is sufficient to satisfy this element of a laches defense." ***Brennan***, 393 Wis. 2d 308, ¶18. In addition, the undisputed facts establish that CUNA lacked "knowledge" that Cain "would" assert the rights on which his suit is based. *See **Sawyer***, 227 Wis. 2d 124, ¶74. Accordingly, the second element of laches is established as a matter of law.

C. Prejudice

¶44 The third element of laches "requires proof of prejudice resulting from the claimant's unreasonable delay." ***Brennan***, 393 Wis. 2d 308, ¶19. Prejudice "depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." ***Wren***, 389 Wis. 2d 516, ¶32 (internal quotations and quoted source omitted). "[P]rejudice to a party for purposes of laches does not mean a party is so disadvantaged that it cannot prosecute its case. The prerequisite under our law is prejudice due to the delay, i.e., disadvantage to a party." ***Id.***, ¶38. There are two types of prejudice that can support a laches defense: evidentiary and economic. ***Id.***, ¶33. Because we conclude that CUNA established economic prejudice, we do not discuss the parties' arguments with respect to evidentiary prejudice. *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

¶45 "[E]conomic prejudice" may arise when "the costs to the defendant have significantly increased due to the delay." ***Wren***, 389 Wis. 2d 516, ¶33 n.26.

Here, the undisputed facts show that, as a result of Cain's delay, CUNA's exposure to liability costs significantly increased.

¶46    As stated, the following facts are undisputed. CUNA has never paid additional compensation to employees whose names have appeared on the sales letters. In 2008, CUNA had over a dozen employees who were licensed in all fifty states and that number had grown to 164 by the time CUNA stopped using Cain's name. Cain himself testified that had he asked for additional compensation, CUNA would have "moved to somebody else" willing to use his or her name on the sales letters and that if he had brought a lawsuit when he first learned that his name was being used, CUNA "had plenty of other individuals that were licensed in all 50 states that they could use on there." Thus, had Cain raised these claims in 2008 or at any point before 2018, the record shows that CUNA had ample alternatives for names. Further, in this lawsuit, CUNA is faced with approximately $8 million in liability for the six-year period applicable to the unjust enrichment claim and over $4 million in liability for the three-year period applicable to the invasion of privacy claim. We agree with CUNA's assessment that it "is faced with a demand that it pay nearly $8 million for something it could have had for free." And as the circuit court aptly put it, "The longer Cain waited, the higher his damages would be." The economic prejudice is clear. Cain's argument to the contrary is unpersuasive.

¶47    Cain argues that "potential damages caused by a defendant's own wrongful conduct" cannot constitute economic prejudice for purposes of laches. Cain acknowledges that there is no Wisconsin case law to support this position. Instead, Cain relies on a federal district court decision, *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386 (E.D. Wis. 1993). According to Cain,

> [*ABB Robotics*] explained that economic prejudice … cannot be due to only potential damages from the defendant's infringing behavior or wrongful conduct; were that the standard, 'economic prejudice would arise in every suit.' Rather, the defendant claiming economic prejudice must show 'a *change* in [its] economic position … during the period of delay,' and the 'change must be because of and as a result of the [plaintiff's] delay, not simply a business decision to capitalize on a market opportunity.'

*See* ***ABB Robotics***, 828 F. Supp. at 1398. Even assuming Cain's interpretation of ***ABB Robotics*** is correct, it does not assist Cain because here, the economic prejudice is in fact because of the delay: had Cain raised his claims earlier, CUNA could have used a different name on its letters and not been exposed to the damages alleged.

¶48 Our conclusion that increased damages from the delay may constitute economic prejudice is supported by the broad language from ***Wren*** set forth above, which states that prejudice is "generally held to be anything that places the party in a less favorable position" and that "economic prejudice" may arise when "the costs to the defendant have significantly increased due to the delay." Further, as CUNA observes, case law from other jurisdictions supports this conclusion. *See*, *e.g.*, ***Nartron Corp. v. STMicroelectronics, Inc.***, 305 F.3d 397, 411-12 (6th Cir. 2002) (holding that "[b]ecause potential damages increase during each year that the claimed mark is used," "the requirement that the delay results in prejudice to the defendant" was satisfied); ***Parts.com, LLC v. Google Inc.***, No. 13-CV-1074, 2014 WL 12461256, at *5 (S.D. Cal. June 25, 2014) (finding prejudice when plaintiff sought more in damages for additional years of alleged infringement than it would have had it filed suit promptly); *see also* ***RSI Corp. v. International Bus. Machs. Corp.***, No. 08-CV-3414, 2012 WL 3277136, at *15-16 (N.D. Cal. Aug. 9, 2012) ("The fact that a defendant continues to engage in its existing practices, thus incurring additional potential liability as a result of

the plaintiff's delay, may also demonstrate prejudice.... Had [plaintiff] raised a challenge to [defendant's] use of the BPA name or its alleged marketing practices earlier, [defendant] would have had an opportunity to change course, substantially reducing its potential liability.").[8]

¶49    In sum, given the broad language from **Wren** regarding economic prejudice, the persuasive authority from other jurisdictions supporting the type of economic prejudice here, and Cain's lack of any persuasive authority to the contrary, we conclude that CUNA established economic prejudice. Accordingly, the third element of laches is satisfied.

*IV. Discretion*

¶50    "Even if all three elements are satisfied, application of laches is left to the sound discretion of the court asked to apply this equitable bar." **Brennan**, 393 Wis. 2d 308, ¶12. The "court *may*—in its discretion—choose not to apply laches if it determines that application of the defense is not appropriate and equitable." **Wren**, 389 Wis. 2d 516, ¶15 (emphasis added). We affirm the circuit court's discretionary decision "as long as the court applied a proper standard of law and employed a demonstrated, rational process to reach a conclusion that a reasonable court could reach[.]" *Id.*, ¶39. Further, "[w]hen we review a

---

[8] In his reply brief, Cain seeks to distinguish **Nartron Corp. v. STMicroelectronics, Inc.**, 305 F.3d 397 (6th Cir. 2002), on grounds that the court in that case operated under a "presumption of laches." *Id.* at 411-12. We conclude that **Nartron** is nonetheless persuasive on the issue of whether increased damages may constitute economic prejudice. As to the other cases set forth above, Cain asserts (with a citation to the record) that he "distinguished" these cases in the circuit court and "reasserts those arguments here." However, we do not consider arguments that are not made in a party's appellate brief. *See* **State v. Flynn**, 190 Wis. 2d 31, 58, 527 N.W.2d 343 (Ct. App. 1994). In any event, Cain's attempts to distinguish these cases in circuit court—based primarily on their application of a presumption of laches—is unconvincing. Like **Nartron**, these other cases are persuasive on the issue of economic prejudice.

discretionary decision, we look for reasons to affirm the [circuit] court's decision, even if its reasoning could have been explained more fully." *Id.*

¶51 Cain argues that that the circuit court "skipped this crucial second step of the laches analysis." We reject this argument.[9] In its sixteen-page decision, the court thoroughly explained why laches applied. The court first explained the three elements of laches, and how the undisputed evidence shows that CUNA satisfied those elements. The court also recited the law regarding the discretionary component, stating, "Even if the party is successful in proving each element, application of laches is left to the discretion of the court." In its conclusion, the court stated: "Based on the foregoing analysis, I find that [CUNA] has proved each element of laches and that application of laches is appropriate." This demonstrates that the court engaged in two separate inquiries: whether the three elements of laches are satisfied and whether application of laches is "appropriate." The court clearly concluded that the application of laches is appropriate for all of the reasons set forth in its detailed decision.

¶52 Cain argues, however, that the circuit court did not do enough to explain its discretionary determination as to why application of laches is "appropriate," suggesting that this in itself constitutes an erroneous exercise of discretion that requires reversal. Cain does not develop this argument beyond its assertions that the court did not "weigh the overall equities" to determine whether it is "fair and just" to apply laches and did not undertake any "rational mental process" to determine such equities. Cain's argument that the court is required to

_____

[9] The parties dispute whether a circuit court is required to specifically address this discretionary component. However, because we conclude that the court did so here, we need not decide this issue.

provide a more detailed explanation is inadequately developed, particularly given the directive in **Wren** that "[w]hen we review a discretionary decision, we look for reasons to affirm the lower court's decision, even if its reasoning could have been explained more fully." **Id.** We therefore reject this undeveloped argument. **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶53 Finally, Cain argues that the equities weigh against the application of laches and that the circuit court erroneously exercised its discretion in applying laches. As CUNA points out, however, Cain never made any argument in the circuit court that the court should exercise its discretion not to apply laches in the event it found that CUNA satisfied the elements of laches.[10] Thus, we could conclude that he has forfeited this argument. *See Schill v. Wisconsin Rapids Sch. Dist.*, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (explaining that issues not raised in the circuit court are forfeited, and supporting the proposition that appellate courts generally do not address forfeited issues). However, even if not forfeited, Cain's arguments regarding his view of the equities of the case are insufficient to meet his heavy burden in demonstrating an erroneous exercise of discretion.

---

[10] In his reply brief, Cain responds to CUNA's forfeiture argument by asserting that he "argued that the circuit court may exercise its discretion not to apply laches, and that application would be contrary to equitable principles." However, the parts of the record to which Cain cites do not reflect that he made a separate argument regarding the discretionary component of laches. Instead, the record excerpts all relate to the three elements of laches.

## CONCLUSION

¶54    For the reasons stated, we affirm the circuit court's order granting summary judgment to CUNA and dismissing Cain's claims on the basis that they are barred by the doctrine of laches.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.